## <u>MEMORANDUM OF UNDERSTANDING</u>

WHEREAS, this Memorandum of Understanding ("MOU") is entered into as of November 4, 2011, by and among the parties to *Coyne v. Pharmaceutical Product Development, Inc.*, *Goodman v. Eshelman*, and *Litwin v. Eshelman* (collectively, the "State Actions"), pending before the North Carolina Business Court in the General Court of Justice before the Superior Court Division (the "North Carolina State Court"); and *Hendricks v. Pharmaceutical Product Development, Inc.* (the "Federal Action"), pending before the United States District Court for the Eastern District of North Carolina (the "Federal Court"), to document the agreement-in-principle for the settlement of the State Actions and the Federal Action (collectively, the "Actions") on the terms and subject to the conditions set forth herein;

WHEREAS, on October 3, 2011, affiliates of TC Group, L.L.C. (d/b/a "The Carlyle Group") and affiliates of Hellman & Friedman LLC (collectively the "Sponsors") and Pharmaceutical Product Development, Inc. ("PPD") announced that they had entered into an Agreement and Plan of Merger, dated as of October 2, 2011, by and among PPD, Jaguar Holdings, LLC, and Jaguar Merger Sub, Inc. (the "Merger Agreement");

WHEREAS, the Merger Agreement contemplates that, among other things, subject to satisfaction of certain closing conditions, including a vote in favor of the merger by a majority of the outstanding shares of PPD stock, PPD will be merged with and into Jaguar Merger Sub, Inc. with PPD surviving as a wholly-owned subsidiary of Jaguar Holdings, LLC (the "Merger");

WHEREAS, on October 5, 2011, Hilary Coyne ("Plaintiff Coyne"), on behalf of herself and all others similarly situated, filed a Class Action Complaint in the North Carolina State Court;

WHEREAS, on October 10, 2011, The Edward J. Goodman Life Income Trust and The Edward Goodman Generation Skipping Trust ("Plaintiff Goodman"), on behalf of themselves

and all others similarly situated, filed a Complaint For Breach Of Fiduciary Duty in the North Carolina State Court;

WHEREAS, on October 11, 2011, Mark Hendricks (the "Federal Plaintiff"), on behalf of himself and all others similarly situated, filed a Class Action Complaint For Breach Of Fiduciary Duty in the Federal Court;

WHEREAS, on October 14, 2011, PPD filed with the United States Securities and Exchange Commission (the "SEC") a Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (the "Preliminary Proxy"), which, among other things, summarizes the Merger Agreement and provides an account of the events leading up to the execution of the Merger Agreement and a summary of the valuation analyses conducted by PPD's board of directors' (the "PPD Board") financial advisors, Morgan Stanley & Co. LLC and Lazard Freres & Co., LLC;

WHEREAS, on October 17, 2011, Harold Litwin ("Plaintiff Litwin"), on behalf of himself and all others similarly situated, filed a Class Action Complaint in the North Carolina State Court (Plaintiff Coyne, Plaintiff Goodman, the Federal Plaintiff and Plaintiff Litwin are referred to collectively as "Plaintiffs");

WHEREAS, on October 18, 2011, the Federal Plaintiff filed an Amended Shareholder Class Action Complaint For Breaches of Fiduciary Duties And Individual Claims For Violation Of Sections 14(a) And 20(a) Of The Securities Exchange Act of 1934, alleging that the Preliminary Proxy was deficient because it failed to provide PPD stockholders with certain material information relevant to the vote of PPD shareholders with respect to the Merger;

WHEREAS, on October 19, 2011, the Federal Plaintiff filed a Motion To Expedite Proceedings and a Motion For Preliminary Injunction;

2

WHEREAS, on October 21, 2011, Plaintiffs Coyne and Goodman filed a joint Amended Class Action Complaint, alleging that the Preliminary Proxy was deficient because it failed to provide PPD stockholders with certain material information relevant to the vote of PPD shareholders with respect to the Merger;

WHEREAS, on October 21, 2011, the Federal Court granted the Federal Plaintiff's Motion For Expedited Discovery and scheduled a hearing for November 15, 2011 on the Federal Plaintiff's Motion For Preliminary Injunction Order;

WHEREAS, on October 21, 2011, PPD and the individual defendants (collectively, the "PPD Defendants") filed a Motion to Stay the Federal Action in Favor of the State Court Actions and a Memorandum Of Law In Opposition To Plaintiff's Motion To Expedite Discovery Proceedings;

WHEREAS, on October 21, 2011, the PPD Defendants filed a Motion Requesting Reconsideration Of Order Expediting Discovery And Setting A Preliminary Injunction Hearing;

WHEREAS, on October 25, 2011, Plaintiffs Coyne and Goodman filed a joint Motion for Preliminary Injunction wherein Plaintiffs Coyne and Goodman asked the North Carolina State Court to preliminarily enjoin the Merger based on the allegations that the Preliminary Proxy was deficient and failed to provide PPD stockholders with certain material information relevant to the vote of PPD shareholders with respect to the Merger;

WHEREAS, on October 26, 2011, the Federal Plaintiff filed papers in Opposition to the PPD Defendants' Motion Requesting Reconsideration Of Order Expediting Discovery And Setting Preliminary Injunction Hearing;

WHEREAS, on October 27, 2011 a hearing was held in Federal Court on the PPD Defendants' Motion Requesting Reconsideration Of Order Expediting Discovery And Setting

Preliminary Injunction Hearing and Motion to Stay the Federal Action in Favor of the State Actions;

WHEREAS, on October 28, 2011, PPD filed with the SEC a definitive proxy statement concerning the Merger (the "Definitive Proxy");

WHEREAS, on October 31, 2011, the Federal Court denied PPD Defendants' Motion Requesting Reconsideration Of Order Expediting Discovery And Setting Preliminary Injunction Hearing and Motion to Stay the Federal Action in Favor of the State Actions;

WHEREAS, counsel for Plaintiffs have conducted discovery that included a review of internal, non-public documents from PPD that included PPD Board minutes and presentations made to the PPD Board by Morgan Stanley & Co. LLC and Lazard Freres & Co., LLC relevant to the claims asserted in the Actions;

WHEREAS, Plaintiffs represent to have owned at all relevant times and continue to own shares of PPD common stock, for which proof of ownership was provided to counsel for the defendants prior to the execution of the MOU;

WHEREAS, counsel for the parties to the Actions have engaged in arm's-length discussions and negotiations concerning a possible settlement of the Actions based on the Plaintiffs' demand for further disclosure to PPD stockholders in connection with the vote of PPD stockholders contemplated by the Merger Agreement;

WHEREAS, after arm's-length negotiations, counsel to the parties in the Actions have reached an agreement-in-principle concerning the proposed settlement of the Actions, which they set forth herein;

WHEREAS, in connection with settlement discussions and negotiations leading to the execution of this MOU, counsel for the parties to the Actions did not discuss the appropriateness

4

or amount of any application by counsel for the Plaintiffs for an award of attorneys' fees and expenses;

WHEREAS, counsel for the Plaintiffs have concluded that the terms contained in this MOU are fair and adequate to PPD stockholders and that it is reasonable to pursue a settlement of the Actions based upon those terms and the procedures outlined herein; and

WHEREAS, PPD, Frederic N. Eshelman, Raymond H. Hill, Ernest Mario, Stuart Bondurant, Frederick Frank, Terry Magnuson, Vaughn D. Bryson, Robert Alexander Ingram, Ralph Snyderman, Jaguar Holdings, LLC, The Carlyle Group, Carlyle Investment Management, L.L.C, Carlyle Partners V, L.P., Hellman & Friedman LLC, Hellman & Friedman, L.P., Hellman & Friedman Capital Partners VII, L.P., Hellman & Friedman Capital Partners VII (Parallel), L.P., Hellman & Friedman Advisors, LLC, HFCP VII (Parallel-A) L.P., H&F Executives VII, L.P. and Jaguar Merger Sub, Inc. (the "Defendants") each has denied, and continues to deny, that he, she, or it committed or aided and abetted the commission of any breach of fiduciary duty or violation of the Securities Exchange Act of 1934, state law, or any other law, or engaged in any of the wrongful acts alleged in the various Actions, and expressly maintains that he, she, or it diligently and scrupulously complied with his, her, or its fiduciary and other legal duties, to the extent such duties exist, and is entering into this MOU solely to eliminate the burden, expense, and uncertainties inherent in further litigation;

NOW THEREFORE, the parties to the Actions have reached an agreement-in-principle providing for the settlement of the Actions on the terms and subject to the conditions set forth below (the "Settlement").

1. As a result of discussions between and among the parties, it is agreed that, in consideration for the full settlement and release of the Settled Claims (as defined below), PPD

5

will make disclosures that are substantially similar to those identified in Exhibit A attached hereto. Without admitting any wrongdoing, Defendants acknowledge that the prosecution of the Actions and discussions with counsel for the Plaintiffs were the principal cause of the decision to make the supplemental disclosures reflected in Exhibit A.

2. Within two (2) business days of the execution of this MOU, counsel for the Plaintiffs shall inform the North Carolina State Court and the Federal Court of the execution of this MOU, and shall request leave of the North Carolina State Court to present the Settlement in the form of a stipulation of settlement for preliminary approval as soon as practicable following completion of confirmatory discovery.

3. PPD and the individual defendants will provide to counsel for the Plaintiffs such reasonable confirmatory discovery (including depositions) as is reasonably necessary for the Plaintiffs to confirm the fairness, reasonableness, and adequacy of the Settlement, and the parties will attempt in good faith, and will seek the cooperation of their financial advisor or advisors, to complete such discovery within a reasonable period of time.

4. No fees or expenses shall be paid to counsel for the Plaintiffs in the absence of consummation of the Merger Agreement and approval of a complete release of all the Released Persons (as defined below). This paragraph shall be immediately binding on the parties to the MOU.

5. The parties will attempt in good faith to agree promptly upon an appropriate stipulation of settlement (the "Stipulation") and such other documentation as may be required to obtain approval of the Settlement, and such Stipulation shall be executed and submitted to the North Carolina State Court for preliminary approval at the earliest practicable time. The Stipulation shall expressly provide that, among other things:

6

(a)     Defendants have denied, and continue to deny, that they have committed or aided and abetted the commission of any breach of duty, violation of the Securities Exchange Act of 1934, state law, or any other law or engaged in any of the wrongful acts alleged in the Actions, and expressly maintain that they diligently and scrupulously complied with their fiduciary and other legal duties, to the extent such duties exist;

(b)     Defendants are entering into the Stipulation solely because the Settlement would eliminate the burden, expense, and uncertainties inherent in further litigation;

(c)     Counsel for the Plaintiffs believe that the Plaintiffs' claims have merit based on proceedings to date, but recognize that the Defendants would continue to assert legal and factual defenses to their claims; and

(d)     Counsel for the Plaintiffs have concluded that the Settlement is fair and adequate, and that it is reasonable to pursue the Settlement based upon the terms and procedures outlined herein.

6.     The Stipulation will further provide for, among other things:

(a)     Appropriate certification of a non-opt out class pursuant to North Carolina Rule of Civil Procedure 23(a), defined as any and all record and beneficial holders of PPD common stock, their respective successors in interest, successors, predecessors in interest, predecessors, representatives, trustees, executors, administrators, heirs, assigns or transferees, immediate and remote, and any person or entity acting for or on behalf of, or claiming under, any of them, and each of them, together with their predecessors and successors and assigns, who held shares of PPD common stock at any time between and including October 3, 2011 and the date of the consummation of the Merger (the "Class").

7

(b)     That all proceedings in the Actions, except for Settlement-related proceedings, shall be stayed until the North Carolina State Court rules upon a motion for final approval of the Settlement;

(c)     The entry of a judgment in an appropriate form, dismissing the Actions with prejudice and barring, among other things, any claims, demands, rights, actions, causes of action, liabilities, damages, losses, obligations, judgments, duties, suits, costs, expenses, matters, and issues known or unknown, contingent or absolute, suspected or unsuspected, disclosed or undisclosed, liquidated or unliquidated, matured or unmatured, accrued or unaccrued, apparent or unapparent, that have been or could have been asserted in any court, tribunal, or proceeding (including, but not limited to, any claims arising under federal, state, foreign, or common law, including the federal securities laws and any state disclosure law), by or on behalf of the Plaintiffs, PPD, or any member of the Class in his, her, or its capacity as a PPD stockholder (and any plaintiff's or Class member's present or past heirs, executors, estates, administrators, predecessors, successors, assigns, parents, subsidiaries, associates, affiliates, employers, employees, agents, consultants, insurers, directors, managing directors, officers, partners, principals, members, attorneys, accountants, financial, legal, and other advisors, investment bankers, underwriters, lenders, and any other representatives of any of these persons and entities) (the "Releasing Persons"), whether individual, direct, class, derivative, representative, legal, equitable, or any other type or in any other capacity against the Defendants or any of their families, parent entities, controlling persons, associates, affiliates, or subsidiaries and each and all of their respective past or present officers, directors, stockholders, principals, representatives, employees, attorneys, financial or investment advisors, consultants, accountants, investment bankers, commercial bankers, entities providing fairness opinions, advisors or agents, heirs,

executors, trustees, general or limited partners or partnerships, limited liability companies, members, joint ventures, personal or legal representatives, estates, administrators, predecessors, successors, or assigns (the "Released Persons") which the Releasing Persons ever had, now have, or may have had by reason of, arising out of, relating to, or in connection with the acts, events, facts, matters, transactions, occurrences, statements, or representations, or any other matter whatsoever set forth in or otherwise related, directly or indirectly, to the allegations in the Actions, the complaints, the Merger Agreement, and other transactions contemplated therein, including the process pursuant to which the Defendants considered, deliberated and negotiated the terms of the Merger Agreement and such contemplated transactions, or disclosures made in connection therewith (including the adequacy and completeness of such disclosures) (the "Settled Claims"); provided, however, that the Settled Claims shall not include any properly perfected claims for appraisal pursuant to N.C. Gen. Stat. § 55-13-02, or claims to enforce the Settlement;

(d)     That Defendants and the Released Persons shall be deemed to have, and by operation of the judgment shall have, fully, finally, and forever released, relinquished, and discharged Plaintiffs, each and all members of the Class, and Plaintiffs' counsel from all claims (including unknown claims) arising out of, relating to, or in connection with, the institution, prosecution, assertion, settlement or resolution of the Actions or the Settled Claims; and

(e)     The preliminary approval order shall contain a provision that pending final determination of whether the Settlement should be approved, Plaintiffs and all members of the Class, and any of them, are barred and enjoined from commencing, prosecuting, instigating or in any way participating in the commencement or prosecution of any action asserting any Settled

Claims, either directly, representatively, derivatively or in any other capacity, against any Released Persons.

7. The Stipulation will include a provision that Plaintiffs acknowledge, and the members of the Class by operation of law shall be deemed to have acknowledged, that they may discover facts in addition to or different from those now known or believed to be true by them with respect to the Settled Claims, but that it is the intention of Plaintiffs, and by operation of law the intention of the members of the Class, to completely, fully, finally and forever compromise, settle, release, discharge, extinguish, and dismiss any and all Settled Claims, known or unknown, suspected or unsuspected, contingent or absolute, accrued or unaccrued, apparent or unapparent, which now exist, or heretofore existed, or may hereafter exist, and without regard to the subsequent discovery of additional or different facts. Plaintiffs acknowledge, and the members of the Class by operation of law shall be deemed to have acknowledged, that "Unknown Claims" are expressly included in the definition of "Settled Claims," and that such inclusion was expressly bargained for and was a key element of the Settlement and was relied upon by each and all of the Released Persons in entering into this Stipulation. "Unknown Claims" means any claim that Plaintiffs or any member of the Class does not know or suspect exists in his, her or its favor at the time of the release of the Settled Claims as against the Released Parties, including without limitation, those which, if known, might have affected the decision to enter into the Settlement.

8. The Settlement is intended to extinguish all of the Settled Claims and, consistent with such intention, the Stipulation will provide that, upon final approval of the Settlement, the Releasing Persons shall waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of any state, federal, or foreign law or principle of common law,

10

which may have the effect of limiting the release set forth above. This shall include a waiver by the Releasing Persons of any rights pursuant to section 1542 of the California Civil Code (or any similar, comparable, or equivalent provision of any federal, state, or foreign law, or principle of common law), which provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Plaintiffs acknowledge, and the members of the Class shall be deemed by operation of the entry of a final order and judgment approving the Settlement to have acknowledged, that the foregoing waiver was separately bargained for, is an integral element of the Settlement, and was relied upon by each and all of the Defendants in entering into the Settlement.

9. The Defendants have the right to withdraw from this MOU and any Settlement contemplated thereby in the event that any litigation related to the Merger is initiated or continues in this Court or any other Court in contravention of the stay contemplated by paragraph 6(b) of the MOU, regardless if such litigation is pursued by a non-party to this MOU.

10. Except as otherwise provided herein, this Settlement shall not be legally binding upon any party unless and until the Stipulation is executed. The Settlement shall be subject to the approval of the North Carolina State Court and any appeals that may be taken with respect to such approval. Should the Stipulation not be executed or not be consummated in accordance with the terms described herein, or the Merger not be consummated for any reason, the Settlement shall be null and void and of no force and effect, and shall not be deemed to prejudice in any way the position of any party with respect to the litigation. In such event, and consistent with the applicable evidentiary rules, neither the existence of this MOU nor its contents shall be

admissible in evidence or shall be referred to for any purpose in the Actions or in any other proceeding.

11.    The parties have not yet discussed attorneys' fees, but intend to do so in good faith at a later time.

12.    The provisions contained in this MOU shall not be deemed a presumption, concession, or admission by any party of any fault, liability, or wrongdoing, or lack of merit as to any facts or claims alleged or asserted in the Actions or in any other action or proceeding, and shall not be interpreted, construed, deemed, invoked, offered, or received into evidence or otherwise used by any person in the Actions or in any other action or proceeding, whether civil, criminal, or administrative, except in connection with any proceeding to enforce the terms of the Settlement.

13.    PPD or its successor(s) in interest shall pay the costs and expenses related to providing notice of the Settlement to the Class, as well as any costs and expenses related to the administration of the Settlement.

14.    Federal Plaintiff shall immediately withdraw his motion for preliminary injunction upon execution of the MOU. The Federal Action shall be dismissed with prejudice within five (5) business days of the final approval of this Settlement.

15.    Each plaintiff and his, her or its counsel represent and warrant that (i) the plaintiff is a PPD stockholder and has been a PPD stockholder at all relevant times and continued to hold their stock in PPD as of the date this MOU was signed, and (ii) none of the plaintiff's claims or causes of action referred to in any of the Complaints or this MOU, or any claims the plaintiff could have alleged, have been assigned, encumbered, or in any manner transferred in whole or in part.

16.     Upon final approval of the Settlement, each member of the Class covenants not to sue, and each member of the Class shall be barred from suing, any Defendant or any other Released Person for any Settled Claim.

17.     In entering into this Settlement, Plaintiffs assume the risk of any mistake of fact or law if Plaintiffs should later discover that any fact they relied upon in entering into this Settlement is not true, or that their understanding of the facts or law was incorrect, and in such event Plaintiffs shall not be entitled to seek rescission of this Settlement, or otherwise attack the validity of the Settlement, based on any such mistake.  This Settlement is intended to be final and binding upon Plaintiffs regardless of any mistake of fact or law.

18.     This MOU constitutes the entire agreement among the parties with respect to the subject matter hereof, and may not be amended nor any of its provisions waived except by a writing signed by all of the parties hereto.

19.     This MOU and the Settlement contemplated by it shall be governed by, and construed in accordance with, the laws of North Carolina, as applicable, without regard to conflict of laws principles.

20.     This MOU may be executed in counterparts by facsimile, email, or original signature by any of the signatories hereto and as so executed shall constitute one agreement.

21.     Subject to paragraph 9, this MOU shall be binding upon and shall inure to the benefit of the parties and their respective agents, successors, executors, heirs, and assigns.

DATED: November 3, 2011

|  | By: ___/s/ William E. Moore Jr.___ <br> William E. Moore, Jr. <br> **GRAY, LAYTON, KERSH, SOLOMON,** <br> **FURR & SMITH, P.A.** <br> 516 South New Hope Road <br> P.O. Box 2636 <br> Gastonia, North Carolina 28053-2636 <br> Tel: 704-865-4400 <br><br> OF COUNSEL: <br><br> **FARUQI & FARUQI, LLP** <br> Nadeem Faruqi <br> Shane T. Rowley <br> Juan E. Monteverde <br> Francis P. McConville <br> 369 Lexington Ave., 10th Floor <br> New York, NY 10017 <br> Tel: 212-983-9330 <br> Fax: 212-983-9331 <br><br> *Attorneys for Mark Hendriks* |
|---|---|
| David D Schiller with express <br> ~~David G. Schiller~~ perm ission by <br> SCHILLER & SCHILLER, PLLC <br> Professional Park at Pleasant Valley <br> 5540 Munford Road, Suite 101 <br> Raleigh, N.C. 27612 <br> Phone: 919-789-4677 <br><br> Of Counsel: <br> GARDY & NOTIS, LLP <br> Mark C. Gardy <br> James Notis <br> Charles A. Germershausen <br> 560 Sylvan Ave, Suite 3085 <br> Englewood, NJ 07632 <br> Phone: 201-567-7377 <br><br> *Attorneys for Hilary Coyne* | Lee M. Whitman <br> Sarah M. Johnson <br> **WYRICK ROBBINS YATES** <br> **& PONTON LLP** <br> Post Office Drawer 17803 <br> Raleigh, North Carolina 27619 <br> Phone: (919) 781-4000 <br> Fax: (919) 781-4865 <br> lwhitman@wyrick.com <br> sjohnson@wyrick.com <br><br> Of Counsel: <br> SKADDEN, ARPS, SLATE, <br> MEAGHER & FLOM LLP <br> Edward P. Welch <br> Edward B. Micheletti <br> One Rodney Square <br> P.O. Box 636 |

14

Case 7:11-cv-00228-BO   Document 55-1   Filed 11/07/11   Page 14 of 56

DATED: November 3, 2011

|  | By: ___/s/ William E. Moore Jr.___<br>William E. Moore, Jr.<br>**GRAY, LAYTON, KERSH, SOLOMON,**<br>**FURR & SMITH, P.A.**<br>516 South New Hope Road<br>P.O. Box 2636<br>Gastonia, North Carolina 28053-2636<br>Tel: 704-865-4400<br><br>OF COUNSEL:<br><br>**FARUQI & FARUQI, LLP**<br>Nadeem Faruqi<br>Shane T. Rowley<br>Juan E. Monteverde<br>Francis P. McConville<br>369 Lexington Ave., 10th Floor<br>New York, NY 10017<br>Tel: 212-983-9330<br>Fax: 212-983-9331<br><br>*Attorneys for Mark Hendriks* |
|---|---|
| David G. Schiller<br>SCHILLER & SCHILLER, PLLC<br>Professional Park at Pleasant Valley<br>5540 Munford Road, Suite 101<br>Raleigh, N.C. 27612<br>Phone: 919-789-4677<br><br>Of Counsel:<br>GARDY& NOTIS, LLP<br>Mark C. Gardy<br>James Notis<br>Charles A. Germershausen<br>560 Sylvan Ave, Suite 3085<br>Englewood, NJ 07632<br>Phone: 201-567-7377<br><br>*Attorneys for Hilary Coyne* | Lee M. Whitman<br>Sarah M. Johnson<br>WYRICK ROBBINS YATES<br> & PONTON LLP<br>Post Office Drawer 17803<br>Raleigh, North Carolina 27619<br>Phone: (919) 781-4000<br>Fax: (919) 781-4865<br>lwhitman@wyrick.com<br>sjohnson@wyrick.com<br><br>Of Counsel:<br>SKADDEN, ARPS, SLATE,<br> MEAGHER & FLOM LLP<br>Edward P. Welch<br>Edward B. Micheletti<br>One Rodney Square<br>P.O. Box 636<br>Wilmington, Delaware 19899-0636 |

Phone: (302) 651-3000

*Attorneys for Defendants Pharmaceutical Product Development, Inc., Frederic N. Eshelman, Raymond H. Hill, Stuart Bondurant, Vaughn D. Bryson, Frederick Frank, Robert A. Ingram, Terry Magnuson, Ernest Mario and Ralph Snyderman*

Janet Ward Black
WARD BLACK LAW
208 W. Wendover Ave.
Greensboro, NC 27401
Phone: 336-333-2244

Of Counsel:
KOHN, SWIFT & GRAF, P.C.
Denis F. Sheils
William E. Hoese
One Broad South Street, Suite 2100
Philadelphia, PA 19107
Phone: 215-238-1700

WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP
Gregory N. Nespole
Matthew M. Guiney
Lydia A. Keaney
270 Madison Ave.
New York, NY 10016
Phone: 212-545-4600

*Attorneys for Edward J. Goodman Life Income Trust and the Edward Goodman Generation Skipping Trust*

Robert W. Fuller
ROBINSON, BRADSHAW & HINSON, P.A.
101 North Tryon Street, Suite 1900
Charlotte, North Carolina 28246
Phone: (704) 377-2536

*Attorneys for Defendants The Carlyle Group, Hellman & Friedman LLC, Carlyle Investment Management, L.L.C., Hellman & Friedman L.P., Hellman & Friedman Advisors LLC, Carlyle Partners V, L.P., Hellman & Friedman Capital Partners VII, L.P., Hellman & Friedman Capital Partners VII (Parallel), L.P., HFCP VII (Parallel A), L.P., H&F Executives VII, L.P., Jaguar Holdings, LLC, and Jaguar Merger Sub, Inc.*

Of Counsel:
SIMPSON THACHER & BARTLETT, LLP
James G. Kreissman
2550 Hanover Street
Palo Alto, California 94304
Phone: (650) 251-5080

*Attorneys for Hellman & Friedman LLC, Hellman & Friedman L.P., Hellman & Friedman Advisors LLC, Hellman & Friedman Capital Partners VII, L.P., Hellman & Friedman Capital Partners VII (Parallel), L.P., HFCP VII (Parallel A), L.P., and H&F Executives VII, L.P.*

LATHAM & WATKINS LLP
Everett C. Johnson, Jr.
J. Christian Word
555 Eleventh Street NW, Suite 1000
Washington, DC 20001-1304
Phone: 202-637-2200

15

|  | *Attorneys for The Carlyle Group, Carlyle Investment Management, L.L.C., Carlyle Partners V, L.P., Jaguar Holdings, LLC, and Jaguar Merger Sub, Inc.* |
|---|---|
| David G. Schiller *permission by Jai Black*<br>SCHILLER & SCHILLER, PLLC<br>Professional Park at Pleasant Valley<br>5540 Munford Road, Suite 101<br>Raleigh, N.C. 27612<br>Phone: 919-789-4677<br><br>Of Counsel:<br>WEISS & LURIE<br>Joseph H. Weiss<br>Mark D. Smilow<br>Richard A. Acocelli<br>551 Fifth Avenue, Suite 1600<br>New York, NY 10176<br>Phone: 212-682-3025<br><br>*Attorneys for Harold Litwin* |  |

# EXHIBIT A

| Information Disclosed In The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| "The directors discussed several potential financial advisors, including Morgan Stanley & Co. LLC, considering their qualifications, experience and any potential conflicts of interest that could arise from representation of competitors or potential buyers. In addition, the Wyrick Robbins representative advised the directors of their duties to shareholders under applicable law in this context." (p 21) | "The directors discussed several potential top tier financial advisors, including Morgan Stanley & Co. LLC, considering their qualifications, experience and any potential conflicts of interest that could arise from representation of competitors or potential buyers. In particular, while Morgan Stanley had not been formally engaged to work for PPD before, it was familiar with the Company and its industry. The board unanimously authorized management to engage Morgan Stanley on terms that are in the best interests of the Company, after confirming that Morgan Stanley was not potentially conflicted by relationships with potential bidders. In addition, the Wyrick Robbins representative advised the directors of their duties to shareholders under applicable law in this context." |
| "Morgan Stanley acted as financial advisor to the board of directors in connection with the merger and will receive a fee currently estimated to be approximately $22.5 million for its services, which fee is contingent upon the closing of the merger. In addition to such fee, the Company has agreed to reimburse Morgan Stanley for its expenses incurred in performing its services, including fees, disbursements and other charges of counsel. The Company also has agreed to indemnify Morgan Stanley and its affiliates, their respective officers, directors, employees and agents and each person, if any, controlling Morgan Stanley or any of its affiliates against certain liabilities and expenses, including certain liabilities under the federal securities laws, related to or arising out of Morgan Stanley's engagement." (p 40.) | "Morgan Stanley acted as financial advisor to the board of directors in connection with the merger and will receive a fee for its services in the amount of 0.55% of the total transaction value. This fee is currently estimated to be approximately $22.5 million. Morgan Stanley's fee is contingent upon the closing of the merger. In addition to such fee, the Company has agreed to reimburse Morgan Stanley for its expenses incurred in performing its services, including fees, disbursements and other charges of counsel. The Company also has agreed to indemnify Morgan Stanley and its affiliates, their respective officers, directors, employees and agents and each person, if any, controlling Morgan Stanley or any of its affiliates against certain liabilities and expenses, including certain liabilities under the federal securities laws, related to or arising out of Morgan Stanley's engagement." |
| "[A]lso at the meeting, in order to provide additional perspective for the board to consider in connection with its analysis of any potential transaction, the board directed management to retain an additional investment bank or financial advisor to conduct analyses and, if possible, render an opinion to the board as to the fairness, from a financial point of view, to the holders of Company common stock of the merger consideration to be paid to those holders in any transaction, | "Also at the meeting, in order to provide additional perspective for the board to consider in connection with its analysis of any potential transaction, the board directed management to retain an additional investment bank or financial advisor, not to contact and negotiate with potential acquirers, but solely to conduct analyses and, if possible, render an opinion to the board as to the fairness, from a financial point of view, to the holders of Company common |

9205.108 694045.v5

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| for a fixed fee payable upon delivery of the opinion and not contingent upon closing of a transaction." (p 24.) | stock of the merger consideration to be paid to those holders in any transaction, for a fixed fee payable upon delivery of the opinion and not contingent upon closing of a transaction. The board did not believe that Morgan Stanley's prior work for Carlyle and H&F and/or their affiliates required retention of an additional financial advisor. However, in addition to providing the board with valuable additional perspective on this important transaction, the board determined that the additional fairness opinion would avoid even the appearance of any conflict of interest that might be implied by Morgan Stanley's customary contingent success-based fee structure." |
| "On July 28, 2011, the board of directors held a meeting in Durham, North Carolina, attended by members of the Company's senior management team and representatives of Morgan Stanley and Wyrick Robbins. Dr. Eshelman, Chief Operating Officer William J. Sharbaugh and Chief Financial Officer Daniel G. Darazsdi reviewed in detail the management presentation case that had been shared with the four potential buyers that previously had met with the Company's management. The board was also presented with the management sensitivity case to provide the board with a more detailed perspective on the risks in the management presentation case, potential results in light of these risks and the assumptions included in the management presentation case and the impact on the value of the Company if the management presentation case is not achieved. Morgan Stanley updated the board of directors regarding certain terms of the indications of interest received on July 25, 2011 and July 26, 2011 from Carlyle, H&F and Bidder E, including the indicative price per share and related assumptions, terms and conditions. Morgan Stanley also provided the board of directors with information about Bidders C and D, which were the two other parties that had been in contact with the Company but had declined to submit indications of interest. Morgan Stanley and the board of directors also discussed the other indications of potential interest received from other parties after the July 17, 2011 publication of the article in The Wall Street Journal and the Company's press release on July 18, 2011, and the fact that these parties did not meet the criteria that the board previously had established." (pp 22-23.) | "On July 28, 2011, the board of directors held a meeting in Durham, North Carolina, attended by members of the Company's senior management team and representatives of Morgan Stanley and Wyrick Robbins. Dr. Eshelman, Chief Operating Officer William J. Sharbaugh and Chief Financial Officer Daniel G. Darazsdi reviewed in detail the management presentation case that had been shared with the four potential buyers that previously had met with the Company's management. The board was also presented with the management sensitivity case to provide the board with a more detailed perspective on the risks in the management presentation case, potential results in light of these risks and the assumptions included in the management presentation case and the impact on the value of the Company if the management presentation case is not achieved. Morgan Stanley updated the board of directors regarding certain terms of the indications of interest received on July 25, 2011 and July 26, 2011 from Carlyle, H&F and Bidder E, including the indicative price per share and related assumptions, terms and conditions. The board carefully considered each of these indications of interest individually, as each represented a potential separate, stand-alone offer. Morgan Stanley also provided the board of directors with information about Bidders C and D, which were the two other parties that had been in contact with the Company but had declined to submit indications of interest. Morgan Stanley and the board of directors also discussed the other indications of potential interest received from other parties after the July 17, 2011 publication of the article in The Wall Street Journal and the Company's press release on July 18, 2011, and the fact that these parties did not meet the criteria that the board previously had established." |
| "The directors discussed several potential financial advisors, including Morgan Stanley & Co. LLC, considering their qualifications, experience and any potential conflicts of interest that could arise from representation of competitors or potential buyers." (p 21.) | "The directors discussed several potential top tier financial advisors, including Morgan Stanley & Co. LLC, considering their qualifications, experience and any potential conflicts of interest that could arise from representation of competitors or potential buyers. In particular, while Morgan Stanley had not |

2

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| | been formally engaged to work for PPD before, it was familiar with the Company and its industry. The board unanimously authorized management to engage Morgan Stanley on terms that are in the best interests of the Company, after confirming that Morgan Stanley was not potentially conflicted by relationships with potential bidders. |
| The board also considered it likely that other industry participants would be either uninterested or lacking the capacity to acquire the Company. The board was advised by the Company's legal counsel about the potential inclusion of a 'go shop' provision in any definitive agreement entered into with a particular bidder, which would permit the Company to continue to solicit acquisition proposals after the signing of the agreement. In light of the concerns discussed, and the board's belief that a post-signing go-shop process would also be available if in fact other industry participants were interested, the board concluded that exploratory discussions should not include other companies in the Company's industry, and that contacts should be made only with a limited number of financial sponsors at this time. ... Following further discussion, the board unanimously approved a two-to-four week exploratory process, focusing on private equity firms that were large enough to finance a transaction with the Company, had previously expressed an interest in the Company or had experience in the CRO sector and did not control competitive companies." (p 21.) | "The board also considered it likely that other industry participants would be either uninterested or lacking the capacity to acquire the Company. The board discussed conducting a limited exploratory sale process with a defined set of private equity firms, provided that all potential industry buyers, including industry participants, would have the opportunity to submit proposals if the board ultimately decided to sell the Company for cash. In this regard, the directors specifically discussed the potential inclusion of a 'go shop' provision in any definitive agreement entered into with a particular bidder, which would permit the Company to continue, after the signing of a definitive agreement, to solicit acquisition proposals that could yield a higher offer price. In light of the concerns discussed, and the board's belief that a post-signing go-shop process would also be available if in fact other industry participants were interested, the board concluded that exploratory discussions should not include other companies in the Company's industry, and that contacts should be made only with a limited number of financial sponsors at this time. ... Following further discussion, the board unanimously approved a two-to-four week exploratory process, focusing on private equity firms that (1) had large enough funds to be able to contribute sufficient equity financing to consummate a transaction with the Company, (2) had previously expressed an interest in the Company or had key personnel with experience in the CRO sector, and (3) did not control competitive companies." |
| The Morgan Stanley representatives also described for the board of directors stand-alone value creation alternatives, including a leveraged recapitalization or similar transaction while remaining an independent public company, and the potential costs and risks associated with the alternatives discussed in view of market developments and conditions. The Morgan Stanley representatives, the Company's management and the board of directors discussed these alternatives and potential financing costs and debt capacity in light of recent trends in the CRO industry and the economy generally, as well as potential execution risks inherent in implementing the alternatives. The Morgan Stanley and Wyrick Robbins representatives then described for the board of directors the potential timing and process if the board determined to pursue a sale of the Company. In executive session with directors only, the board continued its detailed | "The Morgan Stanley representatives also described for the board of directors stand-alone value creation alternatives, including a leveraged recapitalization or similar transaction while remaining an independent public company, and the potential costs and risks associated with the alternatives discussed in view of market developments and conditions. The Morgan Stanley representatives, the Company's management and the board of directors discussed these alternatives and potential financing costs and debt capacity in light of recent trends in the CRO industry and the economy generally, as well as potential execution risks inherent in implementing the alternatives. The Morgan Stanley and Wyrick Robbins representatives then described for the board of directors the potential timing and process if the board determined to pursue a sale of the Company. In executive session with directors only, the board continued its detailed discussion |

3

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| discussion and consideration of the merits and risks of the strategic alternatives available to PPD. ... After extensive consideration of the strategic alternatives available to the Company, the board of directors directed the Company's management and Morgan Stanley to continue exploring the potential sale of the Company and to seek a higher price from Carlyle, which was the highest bidder." (p. 23.) | and consideration of the merits and risks of the strategic alternatives available to PPD. ... After extensive consideration of the strategic alternatives available to the Company and in light of the risks and costs of continuing to operate as an independent public company, the board of directors directed the Company's management and Morgan Stanley to continue exploring the potential sale of the Company and to seek a higher price from Carlyle, which was the highest bidder." |
| **Reasons for the Merger; Recommendation of the Board of Directors** | INSERT NEW 9th BULLET UNDER "Reasons for the Merger; Recommendation of the Board of Directors," ON PAGE 30, AFTER "the fact that, from July 15, 2011, the last trading day . . .": |
| At a meeting held on October 2, 2011, the board of directors, by a unanimous vote, determined that the merger is in the best interests of the Company and our shareholders, approved the execution, delivery and performance of the Company of the merger agreement and the consummation of the transactions contemplated by the merger agreement, which we sometimes refer to as the merger transactions, and resolved that the merger agreement be submitted for consideration by the shareholders at the special meeting and recommended that our shareholders vote to approve the merger agreement. In making its recommendation, the board of directors consulted with our outside legal and financial advisors and our senior management team at various times, and considered a number of factors, including the following principal factors that the board of directors believes support such determinations, approvals, resolutions and recommendations: | • the fact that the $33.25 per share merger consideration agreed to on October 2, 2011 represented a decrease of only 11.3% from Carlyle's July 26, 2011 non-binding indication of interest, while other publicly traded CROs stock prices dropped 27.8% during the same time period, which if matched would have resulted in Carlyle and H&F offering approximately $27.08 per share rather than $33.25 per share;" |
| • the current unstable macro-economic environment, including recent activity related to U.S. governmental debt, unemployment rates, consumer sentiment and Europe's debt crisis; | |
| • uncertainty in the Company's and its customers' industries, due to, among other factors, healthcare reform, industry consolidation and cost-cutting measures, and increasing regulatory scrutiny; | |
| • the directors' knowledge of the Company's business, financial condition, and results of operations, on both an historical and a prospective basis; | |
| • the process leading to the announcement of the merger agreement, including the steps taken to foster competition and the announcement by the Company over two months prior to entering into the merger agreement that it was exploring strategic alternatives, and the board's understanding, as a result of such process, of the level of interest of private equity sponsors and other parties in a transaction with the Company; | |

4

## Information Disclosed in The Preliminary Proxy:

- that discussions had been held with, and feedback received from, multiple private equity bidders as part of the process of exploring the possibility of a transaction;

- the directors' evaluation of the possible alternatives to a sale to Parent, including continuing as a public Company, which alternatives the board of directors evaluated with the assistance of its financial advisor, Morgan Stanley, and determined were likely to be less favorable to the Company's shareholders than the merger given the potential risks, rewards and uncertainties associated with those alternatives;

- the $33.25 per share price to be paid in respect of each share of Company common stock, which represents a 29.6% premium to the closing price for the Company common stock on the Nasdaq Stock Market on September 30, 2011, the last full trading day before the merger was announced;

- the fact that, from July 15, 2011, the last trading day prior to market rumors regarding a potential sale of the Company, when the closing price of the Company's common stock was $27.86 per share, to September 30, 2011, the last trading day prior to the board's approval of the merger agreement, a stock index comprising shares of certain publicly traded CRO companies declined by 27.8%, indicating that the Company's stock price would have declined to approximately $20.12 per share if the leaks regarding a potential transaction had not occurred, the Company had not issued its July 18, 2011 press release and the Company's stock price during that period had declined to the same degree as the index of certain publicly traded CRO companies; (pp 29-30)

In evaluating the selected precedent transactions, Morgan Stanley made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond the control of the Company, such as the impact of competition on the business of the Company or the industry generally, industry growth and the absence of any material adverse change in the financial condition and prospects of the Company or the industry or in the financial

## Additional Disclosures:

"Morgan Stanley used estimated EBITDA, excluding stock based compensation expense, for the twelve-month period ending December 31, 2011 of $329 million, based on Wall Street analysts' consensus expectations, to derive the reference range of implied equity value per share for the Company common stock."

"Morgan Stanley used the share price performance of Covance Inc. from July 15 through September 30, 2011 to calculate the implied unaffected trading price of the Company common stock because Morgan Stanley believed that Covance Inc. was the most comparable publicly traded company in the CRO industry, based on its market capitalization and mix of business. Morgan Stanley also calculated the implied unaffected share price of the Company by reference to the share price performance of an index comprised of Covance Inc., Parexel

| Information Disclosed in The Preliminary Proxy: | | Additional Disclosures: |
|---|---|---|
| markets in general, which could affect the public trading value of the companies and the value of the transactions selected for comparison. Mathematical analysis (such as determining the average or median) is not in itself a meaningful method of using selected transaction data." (p 38.) | | International Corporation, Charles River Laboratories, Inc, ICON plc and WuXi PharmaTech (Cayman) Inc. Morgan Stanley observed that the mean change in share price of the companies included in such index during the period from July 15 through September 30, 2011 was a decrease of 27.8%, implying an unaffected share price for the Company of $20.12." |
| | | See Rider A |
| | | "Lazard used estimated EBITDA, including stock based compensation expense, for the twelve-month period ended September 30, 2011 of $307 million, as provided by Company management, to derive the reference range of implied equity value per share for the Company common stock." |
| | | "Lazard calculated that during the period from July 15, 2011 (the last trading day prior to the publication of an online article in The Wall Street Journal reporting a potential transaction involving the Company) to September 30, 2011, the market cap weighted average share price of the five publicly traded companies referenced under "—Selected Companies Analysis" above declined by approximately 26.9%, while the Company's share price declined by 7.9% during the same period. Lazard believed that the trading price of the Company's common stock might not have declined to the same extent as those other companies' because of the market rumors of a potential acquisition of the Company. Accordingly, Lazard calculated an implied unaffected share price for the Company of $20.37 per share by reducing the Company's closing price on July 15, 2011 (the last trading day prior to the publication of the online article in The Wall Street Journal) by 26.9% and, based on its professional judgment, Lazard applied a premium reference range of 25.0% to 50.0% to this implied unaffected price of $20.37, and derived a reference range of implied equity values per share of the Company common stock of $25.46 to $30.55 per share." |

9

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| "The directors discussed several potential financial advisors, including Morgan Stanley & Co. LLC, considering their qualifications, experience and any potential conflicts of interest that could arise from representation of competitors or potential buyers. In addition, the Wyrick Robbins representative advised the directors of their duties to shareholders under applicable law in this context." (p 21.) | "The directors discussed several potential financial advisors, including Morgan Stanley & Co. LLC, considering their qualifications, experience and any potential conflicts of interest that could arise from representation of competitors or potential buyers. In particular, while Morgan Stanley had not been formally engaged to work for PPD before, it was familiar with the Company and its industry. The board unanimously authorized management to engage Morgan Stanley on terms that are in the best interests of the Company, after confirming that Morgan Stanley was not potentially conflicted by relationships with potential bidders. In addition, the Wyrick Robbins representative advised the directors of their duties to shareholders under applicable law in this context." |
| "Following the direction of the board, on July 1, 2011, the Company retained Morgan Stanley to act as its financial advisor, and to assist the Company in evaluating its strategic plan and capital structure, with a focus on unlocking value for shareholders." (p21) | "Following the direction of the board, PPD management contacted Morgan Stanley regarding their potential engagement, and over the next few days confirmed that Morgan Stanley had no conflicts of interest with potential bidders and negotiated an engagement letter. On July 1, 2011, the Company retained Morgan Stanley to act as its financial advisor, and to assist the Company in evaluating its strategic plan and capital structure, with a focus on unlocking value for shareholders." |
| Morgan Stanley acted as financial advisor to the board of directors in connection with the merger and will receive a fee currently estimated to be approximately $22.5 million for its services, which fee is contingent upon the closing of the merger. In addition to such fee, the Company has agreed to reimburse Morgan Stanley for its expenses incurred in performing its services, including fees, disbursements and other charges of counsel. The Company also has agreed to indemnify Morgan Stanley and its affiliates, their respective officers, directors, employees and agents and each person, if any, controlling Morgan Stanley or any of its affiliates against certain liabilities and expenses, including certain liabilities under the federal securities laws, related to or arising out of Morgan Stanley's engagement. In the two years prior to the date of its opinion, Morgan Stanley provided financial advisory and financing services unrelated to the proposed merger to Carlyle and Hellman & Friedman and certain of their respective majority-owned affiliates and their affiliated investment funds' respective majority-owned portfolio companies. For such services, Morgan Stanley received aggregate fees during the two-year period prior to delivery of Morgan Stanley's opinion on October 2, 2011 of approximately $[—] million (in the case of the Carlyle entities) and approximately $[—] million (in the case of the Hellman & Friedman entities). Morgan Stanley also may seek to provide such services to Carlyle and | "Morgan Stanley acted as financial advisor to the board of directors in connection with the merger and will receive a fee currently estimated to be approximately $22.5 million for its services, which fee is contingent upon the closing of the merger. In addition to such fee, the Company has agreed to reimburse Morgan Stanley for its expenses incurred in performing its services, including fees, disbursements and other charges of counsel. The Company also has agreed to indemnify Morgan Stanley and its affiliates, their respective officers, directors, employees and agents and each person, if any, controlling Morgan Stanley or any of its affiliates against certain liabilities and expenses, including certain liabilities under the federal securities laws, related to or arising out of Morgan Stanley's engagement. In the two years prior to the date of its opinion, Morgan Stanley provided financial advisory and financing services unrelated to the proposed merger to Carlyle and Hellman & Friedman and certain of their respective majority-owned affiliates and their affiliated investment funds' respective majority-owned portfolio companies. For such services, Morgan Stanley received aggregate fees during the two-year period prior to delivery of Morgan Stanley's opinion on October 2, 2011 of approximately $53 million for providing advisory and financing services to Carlyle and its portfolio companies AMC Entertainment, Booz Allen & Hamilton, Caribbean Offshore Investors, Com Hem, Dunkin Brands, H.C. |

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| Hellman & Friedman in the future and expects to receive fees for the rendering of these services." (p 40.) | Starck, Insight Communications, SS&C Technologies, The Nielsen Company and Wesco Aircraft Hardware, and approximately $7million for providing similar services to Hellman & Friedman and its portfolio companies Gartmore and Mondrian Investments. Morgan Stanley also may seek to provide such services to Carlyle and Hellman & Friedman in the future and expects to receive fees for the rendering of these services." |
| "Also at the meeting, in order to provide additional perspective for the board to consider in connection with its analysis of any potential transaction, the board directed management to retain an additional investment bank or financial advisor to conduct analyses and, if possible, render an opinion to the board as to the fairness, from a financial point of view, to the holders of Company common stock of the merger consideration to be paid to those holders in any transaction, for a fixed fee payable upon delivery of the opinion and not contingent upon closing of a transaction." (p 24) | "Also at the meeting, in order to provide additional perspective for the board to consider in connection with its analysis of any potential transaction, the board directed management to retain an additional investment bank or financial advisor, not to contact and negotiate with potential acquirers, but solely to conduct analyses and, if possible, render an opinion to the board as to the fairness, from a financial point of view, to the holders of Company common stock of the merger consideration to be paid to those holders in any transaction, for a fixed fee payable upon delivery of the opinion and not contingent upon closing of a transaction.  The board did not believe that Morgan Stanley's prior work for Carlyle and H&F and/or their affiliates required retention of an additional financial advisor.  However, in addition to providing the board with valuable additional perspective on this important transaction, the board determined that the additional fairness opinion would avoid even the appearance of any conflict of interest that might be implied by Morgan Stanley's customary contingent success-based fee structure." |
| "As directed by the board of directors at the August 1, 2011 meeting, after interviewing several firms, on August 17, 2011, the Company retained Lazard Frères & Co., LLC to conduct analyses and, if possible, render a fairness opinion to the board of directors. The terms of the Company's engagement of Lazard, and the opinion rendered by Lazard to the board of directors with respect to the fairness from a financial point of view of the merger consideration to be paid to the Company shareholders, are described below under "Opinions of the Company's Financial Advisors"." (p 25) | "As directed by the board of directors at the August 1, 2011 meeting, PPD management interviewed several firms to identify one to conduct analyses and, if possible, deliver the second fairness opinion.  Among the criteria used to identify potential such firms were that they not be already engaged by any party involved in the process to date and agree not to accept any engagement from any other party on any other aspect of the transaction, including any debt or equity financing, and that they have some familiarity with the Company and the CRO industry, as well as a reputation for working quickly and efficiently to complete their analyses and, if possible, render a fairness opinion.  PPD management also inquired about any conflicts of interest the firms might have that would prevent them from giving the requested opinion.  As a result of this interview process on August 17, 2011, the Company retained Lazard Frères & Co., LLC to conduct analyses and, if possible, render a fairness opinion to the board of directors.  The terms of the Company's engagement of Lazard, and the opinion rendered by Lazard to the board of directors with respect to the fairness from a financial point of view of the merger consideration to be paid to the Company |

Case 7:11-cv-00228-BO  Document 55-1  Filed 11/07/11  Page 26 of 56

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| | shareholders, are described below under "Opinions of the Company's Financial Advisors"." |
| "As directed by the board of directors at the August 1, 2011 meeting, after interviewing several firms, on August 17, 2011, the Company retained Lazard Frères & Co., LLC to conduct analyses and, if possible, render a fairness opinion to the board of directors. The terms of the Company's engagement of Lazard, and the opinion rendered by Lazard to the board of directors with respect to the fairness from a financial point of view of the merger consideration to be paid to the Company shareholders, are described below under "Opinions of the Company's Financial Advisors"." (p 25) | "As directed by the board of directors at the August 1, 2011 meeting, PPD management interviewed several firms to identify one to conduct analyses and, if possible, deliver the second fairness opinion. Among the criteria used to identify potential such firms were that they not be already engaged by any party involved in the process to date, and that they have some familiarity with the Company and the CRO industry, as well as a reputation for working quickly and efficiently to complete their analyses and, if possible, render a fairness opinion. PPD management also inquired about any conflicts of interest the firms might have that would prevent them from giving the requested opinion. As a result of this interview process, on August 17, 2011, the Company retained Lazard Frères & Co., LLC to conduct analyses and, if possible, render a fairness opinion to the board of directors. The terms of the Company's engagement of Lazard, and the opinion rendered by Lazard to the board of directors with respect to the fairness from a financial point of view of the merger consideration to be paid to the Company shareholders, are described below under "Opinions of the Company's Financial Advisors"." |
| "Lazard in the past has provided, currently is providing and in the future may provide certain investment banking services to certain portfolio companies or other affiliates of Carlyle Group or Hellman & Friedman, for which Lazard received, and may receive, compensation. In the two years prior to the date of its opinion, Lazard provided financial advisory and financing services unrelated to the proposed merger to Carlyle and Hellman & Friedman and certain of their respective majority-owned affiliates and their affiliated investment funds' respective majority-owned portfolio companies. For such services, Lazard received aggregate fees during the two-year period prior to delivery of Lazard's opinion on October 2, 2011 of approximately $[ ] million (in the case of the Carlyle entities) and approximately $[ ] million (in the case of the Hellman & Friedman entities)." (p 47.) | "Lazard in the past has provided, currently is providing and in the future may provide certain investment banking services to certain portfolio companies or other affiliates of Carlyle Group or Hellman & Friedman, for which Lazard received, and may receive, compensation. In the two years prior to the date of its opinion, Lazard provided financial advisory and financing services unrelated to the proposed merger to Carlyle and certain of its majority-owned affiliates and its affiliated investment funds' respective majority-owned portfolio companies. For such services, Lazard received aggregate fees during the two-year period prior to delivery of Lazard's opinion on October 2, 2011 of approximately $21.9 million from the Carlyle entities. During such period, Lazard did not receive any fees from the Hellman & Friedman entities. The services provided by Lazard during that two year period included acting as financial advisor to certain affiliates and portfolio companies of Carlyle Group in connection with the acquisitions of the B&B Hotel Group and Sagemcom, the sale by Covalent Materials Corporation of its silicon wafer business, the initial public offering of Booz Allen Hamilton Holding Corporation, the sale by Zodiac Marine & Pool of its rescue products business, a public offering by Cobalt International Energy, Inc., the offer by Hertz Global Holdings, Inc. to acquire Dollar Thrifty Automotive Group, Inc., the restructuring of |

9

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
|  | Hawaiian Telcom Communications, Inc., and the acquisition by Trimble Navigation Ltd of Tekla Oyj. |
| "At the prior request of the board of directors, the Morgan Stanley representatives presented Morgan Stanley's preliminary views on the value of the Company on a stand-alone public company basis, based on publicly available information and the Company's management presentation case and management sensitivity case. The Morgan Stanley representatives also described for the board of directors stand-alone value creation alternatives, including a leveraged recapitalization or similar transaction while remaining an independent public company, and the potential costs and risks associated with each alternatives discussed in view of market developments and conditions. The Morgan Stanley representatives, the Company's management and the board of directors discussed these alternatives and potential financing costs and debt capacity in light of recent trends in the CRO industry and the economy generally, as well as potential execution risks inherent in implementing the alternatives." (Prelim. Proxy at 23) | "Morgan Stanley reviewed the Company's share price performance over the past two years and its performance relative to other companies in the CRO industry for the 12 months through July 15, 2011, the last trading day prior to the Wall Street Journal article. Representatives of Morgan Stanley noted that despite the Company's improved performance in recent quarters, the Company's stock price had remained relatively flat over the last 12 months. Representatives of Morgan Stanley noted that the Company's stock was trading at a discount to many of its peers in the CRO industry, and at a discount to its three and five-year average multiple on next twelve months earnings." |
| "Based on the respective closing share prices as of September 30, 2011, historical financial information contained in their respective filings with the SEC and Wall Street analysts' estimates, Morgan Stanley calculated and reviewed, among other things, the following statistics for comparative purposes:<br><br>• the ratio of stock price to calendar year 2011 estimated earnings per share, referred to as EPS;<br>• the ratio of the aggregate value, defined as market capitalization plus total debt and minority interest less cash and cash equivalents, to calendar year 2011 estimated earnings before interest, income taxes, depreciation and amortization (excluding equity based compensation expense), referred to as EBITDA;<br>• the ratio of stock price to calendar year 2012 estimated EPS;<br>• the ratio of the aggregate value to calendar year 2012 estimated EBITDA; and<br>• the ratio of P/E multiple to estimated long-term earnings growth rate, or PEG ratio, for 2011." (Prelim. Proxy at 36.)<br><br>"The following table sets forth the high, low and average of the following ratios for the comparable companies, as of September 30, 2011 and as of July 15, 2011 (the last trading day prior to market rumors of a potential transaction involving the Company), in each case based on publicly available research analysts' estimates and public filings: the ratio of the stock price to calendar | See Rider B |

10

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| year 2011 estimated EPS, the ratio of the aggregate value to calendar year 2011 estimated EBITDA, the ratio of stock price to calendar year 2012 estimated EPS, the ratio of the aggregate value to calendar year 2012 estimated EBITDA, and the PEG ratio for 2011:" (p 37) | |
| "The following table sets forth the high, low and average of the following ratios for the comparable companies, as of September 30, 2011 and as of July 15, 2011 (the last trading day prior to market rumors of a potential transaction involving the Company)..." (Prelim. Proxy at 35.) | "Morgan Stanley selected July 15, 2011 as a measurement date because it was the last trading day prior to the publication of an online article in The Wall Street Journal reporting on a potential transaction involving the Company. Morgan Stanley selected September 30, 2011 as a measurement date because it was the last trading day prior to the delivery by Morgan Stanley of its opinion to the Company Board." |
| Morgan Stanley reviewed the purchase prices paid and calculated the ratio of the transaction value to the last 12 months revenue and last 12 months EBITDA, as reflected in the table below, based on publicly available information for the following publicly announced merger and acquisition transactions (resulting in a change of control of the target company) in the contract research organization industry(1)" (Prelim. Proxy at 38, following this there was chart with the transaction value, LTM Revenue and LTM EBITDA for each transaction and the mean and median) | See Rider C |
| Morgan Stanley noted that the transactions with the higher transaction values were more comparable to the merger. Based on its professional judgment and taking into consideration, among other things, the observed multiples for the selected transactions, Morgan Stanley: | |
| • applied AV/LTM EBITDA multiples ranging from 9.0x to 12.0x to the Company's EBITDA for the twelve-month period ending September 30, 2011 and derived a reference range of implied equity value per share of the Company common stock of $29.00 to $36.75, compared to the per share merger consideration of $33.25; | |
| • applied a premium to implied unaffected market price per share of common stock ranging from 25.0% to 40.0% and derived a reference range of implied equity value per share of the Company's common stock of $26.25 to $29.50, compared to the per share merger consideration of $33.25. Morgan Stanley noted that the $33.25 per share merger consideration represented a 29.6% premium to the Company's closing price on September 30, 2011, the last trading day before the announcement of the merger, and a 58.1% premium to the implied unaffected trading price of $21.03, which Morgan Stanley derived by applying the stock price performance of Covance Inc. from | |

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| July 15 to September 30, 2011 to the Company's stock price on July 15, 2011. (p 38.) | |
| "These values were then discounted to present value as of September 30, 2011 assuming a range of discount rates of between 8.5% and 9.5%, which range was selected based on Morgan Stanley's professional judgment and taking into consideration, among other things, a weighted average cost of capital calculation and the Company's assumed cost of equity calculated utilizing a capital asset pricing model." (p 39.) | Information responsive to this request is disclosed in the preliminary proxy statement. |
| "Morgan Stanley also assumed a range of 6.00x to 7.00x for the Company's ratio of total debt to last 12 months EBITDA as at June 30, 2011 and a range of 9.00x to 10.00x for the multiple of Aggregate Value over the next twelve months EBITDA on the exit date, which ranges were selected based on Morgan Stanley's professional judgment and taking into consideration, among other things, the Company's potential debt capacity. In preparing its analysis, Morgan Stanley relied upon the Company's forecasts included in the management sensitivity case." (p 39.) | "In choosing the metrics utilized in its Illustrative Leveraged Buyout Analysis, Morgan Stanley observed recent trends in leveraged acquisitions by financial sponsors, and the multiples at which lenders have demonstrated a willingness to make acquisition debt financing available to financial sponsors in recent months." |
| "The unlevered free cash flows and the terminal values were discounted to present value using discount rates ranging from 8.0% to 10.0%, reflecting estimates of the weighted average cost of capital, or WACC, of the Company derived based on an analysis of estimates of the WACC of the selected companies listed under "Selected Companies Analysis" below." (p 43.) | Information responsive to this request is disclosed in the preliminary proxy statement. |
| Based on the closing share price of the selected companies as of September 30, 2011, historical financial information of the selected companies contained in their filings with the SEC and Wall Street analysts' estimates for the selected companies, Lazard calculated and reviewed, among other things, with respect to each selected company:<br><br>• enterprise value as a multiple of estimated earnings before interest, taxes, depreciation and amortization, or EV/EBITDA multiple, for 2011 and 2012;<br><br>• share price as a multiple of estimated earnings per share, or P/E multiple, for 2011 and 2012; and<br><br>• ratio of P/E multiple to estimated earnings growth rate, or PEG ratio, for 2011 and 2012.<br><br>"The results of this analysis are summarized as follows:"<br><br>2011 Estimated EV/ EBITDA Multiple – High 9.4x, Mean 7.7x, Median 7.7x, Low 5.7x<br><br>2012 Estimated EV/ EBITDA Multiple- High 7.4x, Mean 6.3x, Median 6.5x, Low 5.0x | See Rider D |

12

Case 1:11-cv-00228-B- Document 115-1 Filed 12/07/11 Page 31 of 56

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| 2011 Estimated P/E Multiple - High 18.4x, Mean 14.4x, Median 14.1x, Low 11.0x<br>2012 Estimated P/E Multiple - High 14.2x, Mean 12.3x, Median 13.9x, Low 9.1x<br>2011 Estimated PEG Ratio - High 1.12x, Mean .99x, Median .97x, Low .90x<br>2012 Estimated PEG Ratio - High 1.06x, Mean .87x, Median .86x, Low .75x (p 44.) | As requested by the PPD board, Morgan Stanley and Lazard conducted independent analyses. As a result, in some of those analyses, based on their professional judgment and their different sources of the data, their metrics were not identical, although they were each able to deliver the requested opinion to the board. |
| With respect to each selected transaction and to the extent information was publicly available, Lazard calculated, among other things, the enterprise value of each target company as a multiple of such company's EBITDA for the twelve-month period prior to the date on which the relevant transaction was announced, or EV/LTM EBITDA. The results of this analysis are summarized below [chart saying the Mean EV/LTM EBITDA is 12.8x and Median is 14.2x] Based on the results of the foregoing analysis and Lazard's professional judgment, Lazard applied EV/LTM EBITDA multiples ranging from 10.0x to 14.0x to the Company's EBITDA for the twelve-month period ending September 30, 2011 and derived a reference range of implied equity values per share of the Company common stock of $29.85 to $39.79." (p 45.) | See Rider A |
| For purpose of this analysis, Lazard assumed a 5-year investment period ending December 31, 2016, target internal rates of return ranging from 17.5% to 22.5%, total leverage of 6.6x LTM EBITDA and a range of exit multiples from 7.0x to 10.0x LTM EBITDA at December 31, 2016." (p 46.) | "The assumptions utilized by Lazard were selected based on Lazard's professional judgment and experience and reflected recent trends it observed in leveraged acquisitions with respect to, among other things, the internal rate of returns targeted by financial sponsors and the level of leverage that financial sponsors have been able to obtain from lenders in recent months." |
| In addition to the management presentation case previously disclosed to the potential bidders, following consultation with the Company's advisors, on or about July 20, 2011, Company management completed the preparation of a sensitivity case financial forecast, which we refer to as the management sensitivity case, to assist the board of directors in understanding and evaluating (i) the risks inherent in the management presentation case and (ii) the impact on the value of the Company in the event Company management is unable to achieve the financial forecast in the management presentation case. To achieve | "In addition to the management presentation case previously disclosed to the potential bidders, following consultation with the Company's advisors, on or about July 20, 2011, Company management completed the preparation of a sensitivity case financial forecast, which we refer to as the management sensitivity case, to assist the board of directors in understanding and evaluating (i) the risks inherent in the management presentation case and (ii) the impact on the value of the Company in the event Company management is unable to achieve the financial forecast in the management presentation case. To achieve |

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| that objective, for the management sensitivity case, Company management reduced the projected revenue growth rates in the Company's clinical development segment by two percentage points for each year of the five-year financial forecast, reduced the gross profit rates for the clinical development segment to 50% for each year of the five-year financial forecast, maintained SG&A spending levels in the clinical development segment consistent with the management presentation case, and reduced revenue growth rates for selected laboratory businesses (but maintained the gross profit and SG&A rates for those laboratories). The management sensitivity case was not shared with Carlyle, H&F or any other potential bidders for the Company." (p 22.) | that objective, for the management sensitivity case, Company management reduced the projected revenue growth rates in the Company's clinical development segment by two percentage points for each year of the five-year financial forecast, reduced the gross profit rates for the clinical development segment to 50% for each year of the five-year financial forecast, maintained SG&A spending levels in the clinical development segment consistent with the management presentation case, and reduced revenue growth rates for selected laboratory businesses (but maintained the gross profit and SG&A rates for those laboratories). The management sensitivity case was not shared with Carlyle, H&F or any other potential bidders for the Company. **Neither the management presentation case nor the management sensitivity case were revised after they were initially prepared.**" |
| | **"In their financial analyses, both Morgan Stanley and Lazard utilized full fiscal year estimated data from the Management Base Case and the Management Sensitivity Case, as provided by Company management. In addition, Lazard used data for the twelve months ended September 30, 2011."** |
| "In addition, from time to time over the last few years, several parties, including Carlyle and H&F, have approached the Company regarding possible strategic and investment transactions involving the Company. Prior to the discussions described in the following paragraphs below, representatives of Carlyle and the Company spoke on occasion, including meetings on January 12, 2009 and August 13, 2009, as well as a meeting on June 9, 2011 between Fredric N. Eshelman, Pharm. D., our Executive Chairman, and representatives of Carlyle which Carlyle expressed an interest in acquiring the Company. Similarly, representatives of H&F and the Company spoke on certain occasions, including meetings on April 27, 2009, August 25, 2009, November 19, 2009 and April 4, 2011 at which representatives of H&F had discussions with Dr. Eshelman regarding developments in the CRO industry and H&F's interest in a potential transaction with the Company." (p 20.) | "In addition, from time to time over the last few years, several parties, including Carlyle and H&F, have approached the Company, **primarily through Fredric N. Eshelman, Pharm.D., our Executive Chairman,** regarding possible strategic and investment transactions involving the Company. Prior to the discussions described in the following paragraphs below, representatives of Carlyle and the Company spoke on occasion, including meetings on January 12, 2009 and August 13, 2009, as well as a meeting on June 9, 2011 between **Dr. Eshelman** and representatives of Carlyle in which Carlyle expressed an interest in acquiring the Company. Similarly, representatives of H&F and the Company spoke on certain occasions, including at meetings on April 27, 2009, August 25, 2009, November 19, 2009 and April 4, 2011 at which representatives of H&F had discussions with Dr. Eshelman regarding developments in the CRO industry and H&F's interest in a potential transaction with the Company." |
| "On July 25, 2011, Bidder C informed Morgan Stanley that it would not be submitting an indication of interest. H&F and Bidder E submitted indications of interest on July 25, 2011; after seeking a one-day extension, Carlyle submitted an indication of interest on July 26, 2011." (p 22) | "On July 25, 2011, Bidder C informed Morgan Stanley that it would not be submitting an indication of interest. H&F and Bidder E submitted indications of interest on July 25, 2011. After seeking a one-day extension **in order to receive the required internal approval of the indication of interest at a regularly scheduled committee meeting on July 25, 2011,** Carlyle submitted an indication of interest on July 26, 2011." |
| "On August 25, 2011, representatives of Carlyle had a telephonic discussion | "On August 25, 2011, representatives of Carlyle had a telephonic discussion |

14

with representatives of Morgan Stanley and indicated that Carlyle was having difficulty arranging financing for the merger and that Carlyle was no longer willing to pay $37.50 per share of the Company. Carlyle did not communicate a new price on the call and indicated that it would not be in a position to do so until the following week. On August 26, 2011 representatives of Carlyle told representatives of the Company and Morgan Stanley that one of Carlyle's potential equity partners had indicated it would not pay more than $33.00 per share, that a second potential equity partner was unable to act on the transaction in the short time frame available, and that Carlyle needed an additional one-to-two weeks to permit Carlyle to work with another potential equity partner. On August 29, 2011, representatives of Carlyle told representatives of the Company that Carlyle had arranged for its debt financing and was prepared to pay $34.00 per share, but needed until September 12 to arrange for a commitment from another potential equity partner. Carlyle cited current stock and debt market conditions, which had deteriorated significantly since the beginning of discussions, as well as its inability to fully use PPD cash to fund a portion of the purchase price, including because of restrictions on repatriation of off-shore funds, potential costs to unwind PPD's ongoing accelerated share repurchase program and the Company's pre-existing commitments to invest in various venture and similar funds. In subsequent conversations with representatives of Morgan Stanley, Carlyle indicated that it likely could improve upon its offer, possibly to the level of $35.00 per share. In connection with its efforts to find a potential equity partner in the transaction, Carlyle requested permission to contact H&F, which Carlyle believed had both the financial capability and interest in the CRO industry to be a suitable equity partner." (p 25)

"On August 4, 2011, Wyrick Robbins sent to Latham & Watkins, counsel to Carlyle, the draft merger agreement requested by the board, which included a 40 calendar day "go shop" period, a right of the Company to terminate the agreement to accept a superior proposal if it paid a termination fee (which would be a lower amount if the agreement was with a party identified during the "go shop" period) and a termination fee to be paid to the Company if Carlyle failed to complete the merger in certain circumstances." (p. 24.)

"The Morgan Stanley representatives then reviewed Carlyle's latest proposal and Morgan Stanley's views on potential equity partners to support an offer by Carlyle. Representatives of Morgan Stanley also gave their views on the ability

with representatives of Morgan Stanley and indicated that Carlyle was having difficulty arranging financing for the merger and that Carlyle was no longer willing to pay $37.50 per share of the Company. Carlyle did not communicate a new price on the call and indicated that it would not be in a position to do so until the following week. On August 26, 2011 representatives of Carlyle told representatives of the Company and Morgan Stanley that one of Carlyle's potential equity partners had indicated it would not pay more than $33.00 per share, and that a second potential equity partner was unable to act on the transaction in the short time frame available. None of Carlyle's potential equity partners were involved in the process leading to initial indications of interest regarding a transaction with PPD. Carlyle also said it needed an additional one-to-two weeks to permit Carlyle to work with another potential equity partner. On August 29, 2011, representatives of Carlyle told representatives of the Company that Carlyle had arranged for its debt financing and was prepared to pay $34.00 per share, but needed until September 12 to arrange for a commitment from another potential equity partner. Carlyle cited current stock and debt market conditions, which had deteriorated significantly since the beginning of discussions, as well as its inability to fully use PPD cash to fund a portion of the purchase price, including because of restrictions on repatriation of off-shore funds, potential costs to unwind PPD's ongoing accelerated share repurchase program and the Company's pre-existing commitments to invest in various venture and similar funds. In subsequent conversations with representatives of Morgan Stanley, Carlyle indicated that it likely could improve upon its offer, possibly to the level of $35.00 per share. In connection with its efforts to find a potential equity partner in the transaction, Carlyle requested permission to contact H&F, which Carlyle believed had both the financial capability and interest in the CRO industry to be a suitable equity partner."

"On August 4, 2011, Wyrick Robbins sent to Latham & Watkins, counsel to Carlyle, the draft merger agreement requested by the board. This draft, as directed by the board, included a proposed "go shop" period having a length of 40 calendar days, as well as a right of the Company to terminate the agreement to accept a superior proposal if it paid a termination fee (which would be a lower amount if the agreement was with a party identified during the "go shop" period) and a termination fee to be paid to the Company if Carlyle failed to complete the merger in certain circumstances."

"Representatives of Morgan Stanley expressed the opinion that there were a limited number of private equity firms that would be interested in potentially pursuing an acquisition of the Company with Carlyle, given the amount of

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| of other financial sponsors to arrange the equity and debt financing for a transaction of this size." (p 26) | capital required to effect such a transaction and because many private equity firms had been affected by the decline in the equity and debt markets, including with respect to the cost of debt financing which would negatively affect the internal rates of returns for potential equity partners." |
| "The board also discussed the need for the Company to move forward with its business plan, and in particular the desirability of appointing a Chief Executive Officer to fill the vacancy created by the retirement of David Grange in May 2011. The board unanimously approved the hiring of Raymond H. Hill as the Company's new Chief Executive Officer, and appointed Mr. Hill to the board, both effective September 16, 2011. Due to the fact that the Company was engaged in discussions regarding a potential transaction with Carlyle and H&F that, if agreed, would be completed so soon after Mr. Hill's hiring, Mr. Hill and the Company agreed that his equity awards received upon hiring would not be entitled to participate in the merger consideration." (pp 26-27) | "The board also discussed the need for the Company to move forward with its business plan, and in particular the desirability of appointing a Chief Executive Officer to fill the vacancy created by the retirement of David Grange in May 2011. The board unanimously approved the hiring of Raymond H. Hill as the Company's new Chief Executive Officer, and appointed Mr. Hill to the board, both effective September 16, 2011. Mr. Hill first discussed his potential employment by the Company with the Company's executive search firm in early June 2011. He met with representatives of Carlyle in August, but did not discuss his employment agreement or severance agreement with Carlyle. Due to the fact that the Company was engaged in discussions regarding a potential transaction with Carlyle and H&F that, if agreed, would be completed so soon after Mr. Hill's hiring, Mr. Hill and the Company agreed that his equity awards received upon hiring would not be entitled to participate in the merger consideration." |
| "The board also discussed the need for the Company to move forward with its business plan, and in particular the desirability of appointing a Chief Executive Officer to fill the vacancy created by the retirement of David Grange in May 2011. The board unanimously approved the hiring of Raymond H. Hill as the Company's new Chief Executive Officer, and appointed Mr. Hill to the board, both effective September 16, 2011. Due to the fact that the Company was engaged in discussions regarding a potential transaction with Carlyle and H&F that, if agreed, would be completed so soon after Mr. Hill's hiring, Mr. Hill and the Company agreed that his equity awards received upon hiring would not be entitled to participate in the merger consideration." (pp 26-27) | "The board also discussed the need for the Company to move forward with its business plan, and in particular the desirability of appointing a Chief Executive Officer to fill the vacancy created by the retirement of David Grange in May 2011. The board unanimously approved the hiring of Raymond H. Hill as the Company's new Chief Executive Officer, and appointed Mr. Hill to the board, both effective September 16, 2011. Mr. Hill first discussed his potential employment by the Company with the Company's executive search firm in early June 2011. He met with representatives of Carlyle in August, but did not discuss his employment agreement or severance agreement with Carlyle. Due to the fact that the Company was engaged in discussions regarding a potential transaction with Carlyle and H&F that, if agreed, would be completed so soon after Mr. Hill's hiring, Mr. Hill and the Company agreed that his equity awards received upon hiring would not be entitled to participate in the merger consideration." |
| " 'As of the date of the merger agreement, no members of our current management have entered into any agreement, arrangement or understanding with Parent, Merger Sub or their affiliates regarding employment with, or the right to invest or participate in the equity of, the surviving corporation or Parent or any of its affiliates.' (p 6.) | "As of the date of the merger agreement and through the date of these proxy materials, no members of our current management have had any discussions concerning or entered into any agreement, arrangement or understanding with Parent, Merger Sub or their affiliates regarding employment with, or the right to invest or participate in the equity of, the surviving corporation or Parent or any of its affiliates. Mr. Hill's agreements with us require him to roll over his equity |

16

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| | into equity in any transaction." (p 6) |
| | See two immediately preceding revisions. |
| **"Explanatory Note Regarding the Merger Agreement** | **"Explanatory Note Regarding the Merger Agreement** |
| The merger agreement is included to provide you with information regarding its terms. Factual disclosures about the Company contained in this proxy statement or in the Company's public reports filed with the SEC may supplement, update or modify the factual disclosures about the Company contained in the merger agreement. The representations, warranties and covenants made in the merger agreement by the Company, Parent and Merger Sub were qualified and subject to important limitations agreed to by the Company, Parent and Merger Sub in connection with negotiating the terms of the merger agreement. In particular, in your review of the representations and warranties contained in the merger agreement and described in this summary, it is important to bear in mind that the representations and warranties were negotiated with the principal purposes of establishing the circumstances in which a party to the merger agreement may have the right not to consummate the merger if the representations and warranties of the other party prove to be untrue due to a change in circumstance or otherwise, and allocating risk between the parties to the merger agreement, rather than establishing matters as facts. The representations and warranties may also be subject to a contractual standard of materiality different from those generally applicable to shareholders and reports and documents filed with the SEC, and in some cases were qualified by the matters contained in the exceptions letter that the Company delivered in connection with the merger agreement, which disclosures were not reflected in the merger agreement. Moreover, information concerning the subject matter of the representations and warranties, which do not purport to be accurate as of the date of this proxy statement, may have changed since the date of the merger agreement and subsequent developments or new information qualifying a representation or warranty may have been included in this proxy statement." (p 62) | The merger agreement is included to provide you with information regarding its terms. Factual disclosures about the Company contained in this proxy statement or in the Company's public reports filed with the SEC may supplement, update or modify the factual disclosures about the Company contained in the merger agreement. The representations, warranties and covenants made in the merger agreement by the Company, Parent and Merger Sub were qualified and subject to important limitations agreed to by the Company, Parent and Merger Sub in connection with negotiating the terms of the merger agreement. In particular, in your review of the representations and warranties contained in the merger agreement and described in this summary, it is important to bear in mind that the representations and warranties were negotiated with the principal purposes of establishing the circumstances in which a party to the merger agreement may have the right not to consummate the merger if the representations and warranties of the other party prove to be untrue due to a change in circumstance or otherwise, and allocating risk between the parties to the merger agreement, rather than establishing matters as facts. The representations and warranties may also be subject to a contractual standard of materiality different from those generally applicable to shareholders and reports and documents filed with the SEC, and in some cases were qualified by the matters contained in the exceptions letter that the Company delivered in connection with the merger agreement, which disclosures were not reflected in the merger agreement. ==Any matters included on the Company exceptions letter that are material under the standards generally applicable to shareholders and reports and documents filed with the SEC have been previously disclosed publicly by PPD.== Moreover, information concerning the subject matter of the representations and warranties, which do not purport to be accurate as of the date of this proxy statement, may have changed since the date of the merger agreement and subsequent developments or new information qualifying a representation or warranty may have been included in this proxy statement." |
| "The board discussed the Carlyle and H&F offer, in light of market conditions and the challenges facing the CRO industry. The board also discussed CRO market valuations, and the sensitivity of the Company's share price in a | "The board discussed the Carlyle and H&F offer, in light of market conditions and the challenges facing the CRO industry, ==including general economic and market uncertainties in light of the recent U.S. debt downgrade and ongoing== |

17

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| prolonged period of economic weakness and reduced research and development spending by pharmaceutical companies. The board solicited the views of the Morgan Stanley representatives with respect to the market valuations in the CRO industry and potential trading ranges for the Company's shares if it were to pursue a strategy to remain an independent public company." (pp 27-28.) | European sovereign debt crises, increasing and uncertain healthcare regulation, and potential resulting reduced research and development spending by pharmaceutical companies. The board also discussed CRO market valuations, and the sensitivity of the Company's share price in a prolonged period of economic weakness. The board solicited the views of the Morgan Stanley representatives with respect to the market valuations in the CRO industry and potential trading ranges for the Company's shares if it were to pursue a strategy to remain an independent public company." |

18

## Information Disclosed in The Preliminary Proxy:

"The comparable companies were chosen based on Morgan Stanley's knowledge of the contract research organization industry. Although none of the comparable companies is directly comparable to the Company, the comparable companies are publicly traded companies with operations and/or other criteria, such as lines of business, markets, business risks, growth prospects, maturity of business and size and scale of business, that for purposes of its analysis Morgan Stanley considered similar to the Company." (p 36.)

Based on the respective closing share prices as of September 30, 2011, historical financial information contained in their respective filings with the SEC and Wall Street analysts' estimates, Morgan Stanley calculated and reviewed, among other things, the following statistics for comparative purposes:

- the ratio of stock price to calendar year 2011 estimated earnings per share, referred to as EPS;

- the ratio of the aggregate value, defined as market capitalization plus total debt and minority interest less cash and cash equivalents, to calendar year 2011 estimated earnings before interest, income taxes, depreciation and amortization (excluding equity based compensation expense), referred to as EBITDA;

- the ratio of stock price to calendar year 2012 estimated EPS;

- the ratio of the aggregate value to calendar year 2012 estimated EBITDA; and

- the ratio of P/E multiple to estimated long-term earnings growth rate, or PEG ratio, for 2011." (Prelim. Proxy at 36.)

The following table sets forth the high, low and average of the following ratios for the comparable companies, as of September 30, 2011 and as of July 15, 2011 (the last trading day prior to market rumors of a potential transaction involving the Company), in each case based on publicly available research analysts' estimates and public filings: the ratio of the stock price to calendar year 2011 estimated EPS, the ratio of the aggregate value to calendar year 2011 estimated EBITDA, the ratio of stock price to calendar year 2012 estimated EPS, the ratio of the aggregate value to calendar year 2012 estimated EBITDA, and the PEG ratio for 2011" (p 37 with chart referenced)

## Additional Disclosures:

See Rider E

"Morgan Stanley also considered the following transactions for which the relevant metrics were not publicly disclosed:

Case 7:11-cv-00228-BO   Document 55-1   Filed 11/07/11   Page 38 of 56

20

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| | • the acquisition of Tandem by Labcorp announced on January 24, 2008;<br><br>• the acquisition of AppTec by WuXi PharmaTech announced on January 3, 2008;<br><br>• the acquisition of One Equity Partner's interest in Quintiles by Bain Capital and TPG announced on December 21, 2007; and<br><br>• the acquisition of WIL Research by American Capital announced on July 18, 2007.<br><br>Although the relevant metrics were not publicly disclosed, according to market rumors, the LTM EBITDA multiples for these transaction ranged from 8.0x to 12.0x.<br><br>Morgan Stanley used estimated EBITDA for the twelve-month period ending December 31, 2011 of $329 million, based on Wall Street analysts' consensus expectations and excluding stock based compensation, to derive the reference range of implied equity value per share for the Company common stock.<br><br>Morgan Stanley selected July 15, 2011 as a measurement date because it was the last trading day prior to the publication of an online article in The Wall Street Journal reporting on a potential transaction involving the Company. Morgan Stanley selected September 30, 2011 as a measurement date because it was the last trading day prior to the delivery by Morgan Stanley of its opinion to the Company Board." |
| "Morgan Stanley then calculated a terminal value for the Company by assuming a perpetuity growth rate of 1.0% to 2.0% of unlevered free cash flows, which perpetuity growth rate range was selected based on Morgan Stanley's professional judgment and taking into consideration, among other things, the long-term growth prospects for the Company." (p 39.) | "Although growth rates may be higher or lower in any given year, Morgan Stanley used a perpetual growth rate of 1.0% to 2.0% of unlevered free cash flow, reflecting potential cyclicality in the Company's performance over time, resulting from external factors such as pricing pressure and fluctuations in research and development spending by pharmaceutical companies in periods subsequent to 2016." |
| "Morgan Stanley also assumed a range of 6.00x to 7.00x for the Company's ratio of total debt to last 12 months EBITDA as at June 30, 2011 and a range of 6.00x to 10.00x for the multiple of Aggregate Value over the next twelve months EBITDA on the exit date, which ranges were selected based on Morgan | "In choosing the metrics utilized in its Illustrative Leveraged Buyout Analysis, Morgan Stanley observed recent trends in leveraged acquisitions by financial sponsors, and the multiples at which lenders have demonstrated a willingness to make acquisition debt financing available to financial sponsors in recent |

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| Stanley's professional judgment and taking into consideration, among other things, the Company's potential debt capacity. In preparing its analysis, Morgan Stanley relied upon the Company's forecasts included in the management sensitivity case." (p 39) | months". |
| "With the consent of the Company, Morgan Stanley gave greater weight to the management sensitivity case in its analysis. This decision was based on discussions with the Company's management and board of directors regarding risks underlying, and uncertainty of achieving, the forecasts reflected in the management presentation case, including with respect to the fact that the management presentation case was prepared in June 2011 and failed to account for the deterioration of the macroeconomic environment since that time, including the risk to future global economic growth from issues such as such as the European sovereign debt crisis and the downgrading of the United States debt." (p 35.) | In determining to give greater weight to the Management Sensitivity Case, Morgan Stanley also cited the potential for a sustained downturn in general economic conditions which could negatively affect research and development spending by pharmaceutical companies. |
| "Lazard calculated terminal values for the Company as of December 31, 2016 by discounting to present value as of that date estimates of the Company's unlevered free cash flow for the period after 2016 derived by applying perpetuity growth rates ranging from 1.0% to 2.0% to estimated unlevered free cash flow of the Company for 2016. The unlevered free cash flows and the terminal values were discounted to present value using discount rates ranging from 8.0% to 10.0%, reflecting estimates of the weighted average cost of capital, or WACC, of the Company derived based on an analysis of estimates of the WACC of the selected companies listed under "Selected Companies analysis" below." (p 43.) | "Although growth rates might be higher or lower in any given year, Lazard applied a perpetual growth rate of 1.0% to 2.0% to estimated 2016 unlevered free cash flow, as a result of the cyclicality in the Company's performance over time resulting from external factors such as pricing pressure and fluctuations in research and development spending by pharmaceutical companies in periods subsequent to 2016." |
| "With respect to each selected transaction and to the extent information was publicly available, Lazard calculated, among other things, the enterprise value of each target company as a multiple of such company's EBITDA for the twelve-month period prior to the date on which the relevant transaction was announced, or EV/LTM EBITDA. The results of this analysis are summarized below [chart saying the Mean EV/LTM EBITDA is 12.8x and Median is 14.2x] based on the results of the foregoing analysis and Lazard's professional judgment, Lazard applied EV/LTM EBITDA multiples ranging from 10.0x to 19.0x to the Company's EBITDA for the twelve-month period ending September 30, 2011 and derived a reference range of implied equity values per share of the Company common stock of $29.85 to $39.79." (p 45.) | See Rider A<br><br>"Lazard used estimated EBITDA, including stock based compensation expense, for the twelve-month period ended September 30, 2011 of $307 million, as provided by Company management, to derive the reference range of implied equity value per share for the Company common stock." |
| "Lazard performed a leveraged buyout return analysis based on the Company's forecasts included in the management presentation case and the management sensitivity case to determine the range of prices per share of the Company | "The assumptions utilized by Lazard were selected based on Lazard's professional judgment and experience and reflected recent trends it observed in leveraged acquisitions with respect to, among other things, |

21

Case 1:11-cv-00217-RBC Document 55-1 Filed 11/05/11 Page 39 of

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| common stock a financial buyer would be willing pay to acquire the Company on a stand-alone basis. For purpose of this analysis, Lazard assumed a 5-year investment period ending December 31, 2016, target internal rates of return ranging from 17.5% to 22.5%, total leverage of 6.6x LTM EBITDA and a range of exit multiples from 8.0x to 10.0x LTM EBITDA at December 31, 2016. This analysis resulted in a range of per share purchase prices for the Company common stock from $31.48 to $39.40 based on forecasts included in the management presentation case, and from $29.44 to $36.43 based on forecasts included in the management sensitivity case." (p 46.) | the internal rate of returns targeted by financial sponsors and the level of leverage that financial sponsors have been able to obtain from lenders in recent months." |
| Based on the foregoing results and Lazard's professional judgment, Lazard applied a premium reference range of 25.0% to 50.0% to the closing price of the Company common stock as of July 15, 2011, the last trading day before the Company announced that its board of directors had asked Company management to review the Company's strategic plan and capital structure, of $27.86, or the "unaffected price", and derived a reference range of implied equity values per share of the Company common stock of $34.83 to $41.79. In addition, based on the foregoing results and Lazard's professional judgment, Lazard applied the same premium reference range of 25.0% to 50.0% to an implied unaffected price of $20.37, which is the product of (x) the unaffected price and (y) the sum of one plus the market-cap weighted average of the change in closing stock prices of the selected companies listed under "Selected Companies Analysis" above from July 15, 2011 to September 30, 2011, and derived a reference range of implied equity values per share of the Company common stock of $25.46 to $30.55." (p 46.) | "Lazard calculated that during the period from July 15, 2011 (the last trading day prior to the publication of an online article in The Wall Street Journal reporting a potential transaction involving the Company) to September 30, 2011, the market cap weighted average share price of the five publicly traded companies referenced under " Selected Companies Analysis' above declined by approximately 26.9%, while the Company's share price declined by 7.9% during the same period. Lazard believed that the trading price of the Company's common stock might not have declined to the same extent as those other companies' because of the market rumors of a potential acquisition of the Company. Accordingly, Lazard calculated an implied unaffected share price for the Company of $20.37 per share by reducing the Company's closing price on July 15, 2011 (the last trading day prior to the publication of the online article in The Wall Street Journal) by 26.9% and, based on its professional judgment, Lazard applied a premium reference range of 25.0% to 50.0% to this implied unaffected price of $20.37, and derived a reference range of implied equity values per share of the Company common stock of $25.46 to $30.55 per share. " |
| Based on discussions with management of the Company regarding the risks underlying, and uncertainty of achieving, the forecasts reflected in the management presentation case, with the consent of the Company, Lazard gave greater weight to the management sensitivity case in its analysis." (p 42.) | "These risks and uncertainties included the potential for a sustained downturn in general economic conditions which could negatively affect research and development spending by pharmaceutical companies."

**See Rider F** |
| "In the two years prior to the date of its opinion, Morgan Stanley provided financial advisory and financing services unrelated to the proposed merger to Carlyle and Hellman & Friedman and certain of their respective majority-owned affiliates and their affiliated investment funds' respective majority-owned portfolio companies. For such services, Morgan Stanley received aggregate fees during the two-year period prior to delivery of Morgan Stanley's opinion on October 2, 2011 of approximately $[ ] million (in the case of the Carlyle entities) and approximately $[ ] million (in the case of the Hellman & | "In the two years prior to the date of its opinion, Morgan Stanley provided financial advisory and financing services unrelated to the proposed merger to Carlyle and Hellman & Friedman and certain of their respective majority-owned affiliates and their affiliated investment funds' respective majority-owned portfolio companies. For such services, Morgan Stanley received aggregate fees during the two-year period prior to delivery of Morgan Stanley's opinion on October 2, 2011 of approximately $53 million for providing advisory and financing services to Carlyle and its portfolio companies AMC Entertainment, |

22

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| Friedman entities)." (p 40.) | Booz Allen & Hamilton, Caribbean Offshore Investors, Com Hem, Dunkin Brands, H.C. Starck, Insight Communications, SS&C Technologies, The Nielsen Company and Wesco Aircraft Hardware, and approximately $7 million for providing similar services to Hellman & Friedman and its portfolio companies Gartmore and Mondrian Investments. Morgan Stanley also may seek to provide such services to Carlyle and Hellman & Friedman in the future and expects to receive fees for the rendering of these services." |
| "Lazard in the past has provided, currently is providing and in the future may provide certain investment banking services to certain portfolio companies or other affiliates of Carlyle Group or Hellman & Friedman, for which Lazard received, and may receive, compensation. In the two years prior to the date of its opinion, Lazard provided financial advisory and financing services unrelated to the proposed merger to Carlyle and Hellman & Friedman and certain of their respective majority-owned portfolio companies. For such services, Lazard received aggregate fees during the two-year period prior to delivery of Lazard's opinion on October 2, 2011 of approximately $[☐] million (in the case of the Carlyle entities) and approximately $[☐] million (in the case of the Hellman & Friedman entities)." (p 47.) | "Lazard in the past has provided, currently is providing and in the future may provide certain investment banking services to certain portfolio companies or other affiliates of Carlyle Group or Hellman & Friedman, for which Lazard received, and may receive, compensation. In the two years prior to the date of its opinion, Lazard provided financial advisory and financing services unrelated to the proposed merger to Carlyle and certain of its majority-owned affiliates and its affiliated investment funds' respective majority-owned portfolio companies. For such services, Lazard received aggregate fees during the two-year period prior to delivery of Lazard's opinion on October 2, 2011 of approximately $21.9 million from the Carlyle entities. During such period, Lazard did not receive any fees from the Hellman & Friedman entities. The services provided by Lazard to the Carlyle entities during that two year period included acting as financial advisor to certain affiliates and portfolio companies of Carlyle Group in connection with the acquisitions of the B&B Hotel Group and Sagemcom, the sale by Covalent Materials Corporation of its silicon wafer business, the initial public offering of Booz Allen Hamilton Holding Corporation, the sale by Zodiac Marine & Pool of its rescue products business, a public offering by Cobalt International Energy, Inc., the offer by Hertz Global Holdings, Inc. to acquire Dollar Thrifty Automotive Group, Inc., the restructuring of Hawaiian Telcom Communications, Inc., and the acquisition by Trimble Navigation Ltd of Tekla Oyj." |
| "We anticipate that the total funds needed to complete the merger, including the funds needed to: | **Financing of the Merger** |
|  | "We anticipate that the total funds needed to complete the merger, including the funds needed to: |
| • pay our shareholders (and holders of our other equity-based interests) the amounts due to them under the merger agreement, which, based upon the shares of Company common stock (and our other equity-based interests) outstanding as of September | • pay our shareholders (and holders of our other equity-based interests) the amounts due to them under the merger agreement, |

Case 7:11-cv-00228-BO    Document 55-1    Filed 11/07/11    Page 41 of 56

Case 7:11-cv-00228-BO   Document 55-1   Filed 11/07/11   Page 42 of 56

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| 30, 2011, would be approximately $3.9 billion; and<br><br>• pay fees and expenses related to the merger and the debt that will finance the merger,<br><br>will be funded through a combination of:<br><br>• equity financing of up to approximately $1.76 billion in the aggregate to be provided by investment funds affiliated with Carlyle and investment funds affiliated with Hellman & Friedman, or other parties to which they assign a portion of their commitments;<br><br>• borrowings of $1.325 billion under a senior secured term loan facility;<br><br>• the issuance of up to $700 million in aggregate principal amount of senior unsecured notes (or, to the extent those notes are not issued at or prior to the closing of the merger, borrowings of up to $700 million under a senior unsecured bridge credit facility); and<br><br>• excess cash on hand of the Company." (p 49)<br><br>"At the prior request of the board of directors, the Morgan Stanley representatives presented Morgan Stanley's preliminary views on the value of the Company on a stand-alone public company basis, based on publicly available information and the Company's management presentation case and management sensitivity case. The Morgan Stanley representatives also described for the board of directors stand-alone value creation alternatives, including a leveraged recapitalization or similar transaction while remaining an | which, based upon the shares of Company common stock (and our other equity-based interests) outstanding as of September 30, 2011, would be approximately $3.9 billion; and<br><br>• pay fees and expenses related to the merger and the debt that will finance the merger,<br><br>will be funded through a combination of:<br><br>• equity financing of up to approximately $1.76 billion in the aggregate to be provided by investment funds affiliated with Carlyle and investment funds affiliated with Hellman & Friedman, or other parties to which they assign a portion of their commitments;<br><br>• borrowings of $1.325 billion under a senior secured term loan facility;<br><br>• the issuance of up to $700 million in aggregate principal amount of senior unsecured notes (or, to the extent those notes are not issued at or prior to the closing of the merger, borrowings of up to $700 million under a senior unsecured bridge credit facility); and<br><br>• excess cash on hand of the Company.<br><br>Carlyle and H&F considered various financing options, including the possibility of mezzanine financing, before determining to proceed with the financing structure described above."<br><br>"At the prior request of the board of directors, the Morgan Stanley representatives presented Morgan Stanley's preliminary views on the value of the Company on a stand-alone public company basis, based on publicly available information and the Company's management presentation case and management sensitivity case. These views included comparisons of the Company to its publicly traded peers in the CRO industry in terms of share price, valuation metrics and leverage, as well as its prospects under the |

24

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| independent public company, and the potential costs and risks associated with the alternatives discussed in view of market developments and conditions. The Morgan Stanley representatives, the Company's management and the board of directors discussed these alternatives and potential financing costs and debt capacity in light of recent trends in the CRO industry and the economy generally, as well as potential execution risks inherent in implementing the alternatives. | management presentation case and the management sensitivity case, the underlying assumptions in those forecasts, related risks that might prevent achieving those forecasts and the potential implications for future valuation of the Company. The Morgan Stanley representatives also described for the board of directors stand-alone value creation alternatives, including a leveraged recapitalization or similar transaction while remaining an independent public company, and the potential costs and risks associated with the alternatives discussed in view of market developments and conditions. The Morgan Stanley representatives, the Company's management and the board of directors discussed these alternatives and potential financing costs and debt capacity in light of recent trends in the CRO industry and the economy generally, as well as potential execution risks inherent in implementing the alternatives. |
| After extensive consideration of the strategic alternatives available to the Company, the board of directors directed the Company's management and Morgan Stanley to continue exploring the potential sale of the Company and to seek a higher price from Carlyle, which was the highest bidder. Representatives of Morgan Stanley and the Company negotiated with Carlyle over the next few days, and following such negotiations, on July 31, 2011, Carlyle communicated that it would increase its July 26, 2011 indication of interest to \$37.50 per share to the Company would agree to deal exclusively with Carlyle with respect to negotiation of any potential change of control transaction. During this period, each of H&F and Bidder E continued to contact Morgan Stanley to pursue discussions regarding their respective indications of interest." (p 23.) | After extensive consideration of the strategic alternatives available to the Company, the board of directors determined that in order to be able to pursue the best interests of the shareholders they should continue to explore the potential sale of the Company.  Therefore, the board directed the Company's management and Morgan Stanley to continue exploring the potential sale of the Company and to seek a higher price from Carlyle, which was the highest bidder. Representatives of Morgan Stanley and the Company negotiated with Carlyle over the next few days, and following such negotiations, on July 31, 2011, Carlyle communicated that it would increase its July 26, 2011 indication of interest to \$37.50 per share if the Company would agree to deal exclusively with Carlyle with respect to negotiation of any potential change of control transaction. During this period, each of H&F and Bidder E continued to contact Morgan Stanley to pursue discussions regarding their respective indications of interest." |
| "Following further discussion, the board unanimously approved a two-to-four week exploratory process, focusing on private equity firms that were large enough to finance a transaction with the Company, had previously expressed an interest in the Company or had experience in the CRO sector, and did not control competitive companies." (p 21.) | "Following further discussion, the board unanimously approved a two-to-four week exploratory process, focusing on private equity firms that (1) had large enough funds to be able to contribute sufficient equity financing to consummate a transaction with the Company, (2) had previously expressed an interest in the Company or had key personnel with experience in the CRO sector, and (3) did not control competitive companies." |
| "The private equity firm with sector experience was the only one of the additional potentially interested parties that met the board's three criteria." (p 22.) | "The private equity firm with sector experience was the only one of the additional potentially interested parties that met the board's three criteria.  The other parties did not meet the board's criteria and were therefore not included at that |

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| "The directors discussed several potential financial advisors, including Morgan Stanley & Co. LLC, considering their qualifications, experience and any potential conflicts of interest that could arise from representation of competitors or potential buyers." (p 21.)<br><br>Also at the meeting, in order to provide additional perspective for the board to consider in connection with its analysis of any potential transaction, the board directed management to retain an additional investment bank or financial advisor to conduct analyses and, if possible, render an opinion to the board as to the fairness, from a financial point of view, to the holders of Company common stock of the merger consideration to be paid to those holders in any transaction, for a fixed fee payable upon delivery of the opinion and not contingent upon closing of a transaction." (p 24.) | "The directors discussed several potential top tier financial advisors, including Morgan Stanley & Co. LLC, considering their qualifications, experience and any potential conflicts of interest that could arise from representation of competitors or potential buyers.  In particular, while Morgan Stanley had not been formally engaged to work for PPD before, it was familiar with the Company and its industry.  The board unanimously authorized management to engage Morgan Stanley on terms that are in the best interests of the Company, after confirming that Morgan Stanley was not potentially conflicted by relationships with potential bidders."<br><br>"Also at the meeting, in order to provide additional perspective for the board to consider in connection with its analysis of any potential transaction, the board directed management to retain an additional investment bank or financial advisor, not to contact and negotiate with potential acquirers, but solely to conduct analyses and, if possible, render an opinion to the board as to the fairness, from a financial point of view, to the holders of Company common stock of the merger consideration to be paid to those holders in any transaction, for a fixed fee payable upon delivery of the opinion and not contingent upon closing of a transaction.  The board did not believe that Morgan Stanley's prior work for Carlyle and H&F and/or their affiliates required retention of an additional financial advisor.  However, in addition to providing the board with valuable additional perspective on this important transaction, the board determined that the additional fairness opinion would avoid even the appearance of any conflict of interest that might be implied by Morgan Stanley's customary contingent success-based fee structure." |
| The board discussed reasons for exploring a sale of the Company at this time, and the risks inherent in so doing, particularly the risk that competitors in the Company's industry might use information about a potential transaction involving the Company's employees and customers, and the risk that a leak regarding a possible transaction could disrupt customer relations.  The board also considered it likely that other industry participants would be either uninterested or lacking the capacity to acquire the Company.  The board was advised by the Company's legal counsel about the potential inclusion of a "go shop" provision in any definitive agreement entered into with a particular bidder, which would permit the Company to continue to solicit | See immediately preceding point.<br><br>"The board discussed reasons for exploring a sale of the Company at this time, and the risks inherent in so doing.  They noted in particular the risk that competitors in the Company's industry might use information about a potential transaction involving the Company's employees and customers, and the risk that a leak regarding a possible transaction with a strategic buyer could disrupt customer relations.  The board also considered it likely that other industry participants would be either uninterested or lacking the capacity to acquire the Company.  The board concluded that this fact, combined with the likelihood and potential negative impact to the Company and its shareholders of the related risks outweighed the benefits of contacting |

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| acquisition proposals after the signing of the agreement. In light of the concerns discussed, and the board's belief that a post-signing go-shop process would also be available if in fact other industry participants were interested, the board concluded that exploratory discussions should not include other companies in the Company's industry, and that contacts should be made only with a limited number of financial sponsors at this time." (p 21.) | competitors at this time. The board discussed conducting a limited exploratory sale process with a defined set of private equity firms, provided that all potential buyers, including industry participants, would have the opportunity to submit proposals if the board ultimately decided to sell the Company for cash. In this regard, the directors specifically discussed the potential inclusion of a 'go shop' provision in any definitive agreement entered into with a particular bidder, which would permit the Company to continue, after the signing of a definitive agreement, to solicit acquisition proposals that could yield a higher offer price. In light of the concerns discussed, and the board's belief that a post-signing go-shop process would also be available if in fact other industry participants were interested, the board concluded that exploratory discussions should not include other companies in the Company's industry, and that contacts should be made only with a limited number of financial sponsors at this time." |
| "Following further discussion, the board unanimously approved a two-to-four week exploratory process, focusing on private equity firms that were large enough to finance a transaction with the Company, had previously expressed an interest in the Company or had experience in the CRO sector and did not control competitive companies." (p 21.) | "Following further discussion, the board unanimously approved a two-to-four week exploratory process, focusing on private equity firms that (1) had large enough funds to be able to contribute sufficient equity financing to consummate a transaction with the Company, (2) had previously expressed an interest in the Company or had key personnel with experience in the CRO sector, and (3) did not control competitive companies." |
| The board discussed the Carlyle and H&F offer, in light of market conditions and the challenges facing the CRO industry. The board also discussed CRO market valuations, and the sensitivity of the Company's share price in a prolonged period of economic weakness and reduced research and development spending by pharmaceutical companies. The board solicited the views of the Morgan Stanley representatives with respect to the market valuations in the CRO industry and potential trading ranges for the Company's shares if it were to pursue a strategy to remain an independent public company. A Wyrick Robbins attorney summarized the open points in the merger agreement, including the amount of the various termination fees and timing of the marketing period for the debt financing. After considerable discussion and deliberation, the board unanimously indicated it was in favor of proceeding with a sale of the Company to Carlyle and H&F at a price of $33.25 per share, subject to negotiation of the definitive agreement and receipt of fairness opinions from Morgan Stanley and Lazard." (p 27-28.) | "The board discussed the Carlyle and H&F offer, in light of market conditions and the challenges facing the CRO industry, including general economic and market uncertainties in light of the recent U.S. debt downgrade and ongoing European sovereign debt crises, increasing and uncertain healthcare regulation, and potential resulting reduced research and development spending by pharmaceutical companies. The board also discussed CRO market valuations, and the sensitivity of the Company's share price in a prolonged period of economic weakness. The board solicited the views of the Morgan Stanley representatives with respect to the market valuations in the CRO industry and potential trading ranges for the Company's shares if it were to pursue a strategy to remain an independent public company. A Wyrick Robbins attorney summarized the open points in the merger agreement, including the amount of the various termination fees and timing of the marketing period for the debt financing. After considerable discussion and deliberation, including consideration of the advisability and likelihood of rejection of any further attempts to set a higher price like its prior requests of offers at $35.00 and then at $34.00, the board unanimously indicated it was in favor of proceeding with a |

Case 7:11-cv-00228-BO   Document 55-1   Filed 11/21/11   Page 45 of 56

| Information Disclosed in The Preliminary Proxy: | Additional Disclosures: |
|---|---|
| | sale of the Company to Carlyle and H&F at a price of $33.25 per share, subject to negotiation of the definitive agreement and receipt of fairness opinions from Morgan Stanley and Lazard." |
| | ALSO INSERT NEW 9[th] BULLET UNDER "Reasons for the Merger; Recommendation of the Board of Directors," ON PAGE 30, AFTER "the fact that, from July 15, 2011, the last trading day . . .": |
| | • the fact that the $33.25 per share merger consideration agreed to on October 2, 2011 represented a decrease of only 11.3% from Carlyle's July 26, 2011 non-binding indication of interest, while other publicly traded CROs stock prices dropped 27.8% during the same time period, which if matched would have resulted in Carlyle and H&F offering approximately $27.08 per share rather than $33.25 per share;" |
| "At the direction of the board of directors, Morgan Stanley is conducting the "go-shop" process on behalf of the Company. In this process, through October 27, 2011, Morgan Stanley has contacted a total of 22 parties, comprised of 9 strategic parties and 13 financial parties, to determine whether they would be interested in exploring a transaction with the Company that would be superior to the merger. The contacted parties include competitors of the Company that expressed interest in participating in the sale process earlier but were not invited to do so at that time, as described in the preceding discussion. Of the parties contacted, through October 13, 2011, one party has entered into a confidentiality agreement with the Company substantially similar to the confidentiality agreements entered into between the Company and Carlyle, and the Company and H&F. As a result, we provided that party with an initial information package containing limited confidential information regarding the Company. As of October 13, 2011, such party has not submitted an acquisition proposal to the Company." (p 29.) | "At the direction of the board of directors, Morgan Stanley is conducting the "go-shop" process on behalf of the Company. In this process, through [October 27], 2011, Morgan Stanley had contacted a total of 22 parties, comprised of 9 strategic parties and 13 financial parties, including Bidder E, to determine whether they would be interested in exploring a transaction with the Company that would be superior to the merger. The contacted parties include competitors of the Company that expressed interest in participating in the sale process earlier but were not invited to do so at that time, as described in the preceding discussion. Of the parties contacted, through [October 27], 2011, only one party, a competing business owned by a financial party, expressed any interest. That party entered into a confidentiality agreement with the Company substantially similar to the confidentiality agreements entered into between the Company and Carlyle, and the Company and H&F. As a result, we provided that party with an initial information package containing limited confidential information regarding the Company, including the management presentation case financial projections provided to Carlyle and H&F in the initial part of our process. On October 18, 2011, such party told Morgan Stanley it would not be submitting an acquisition proposal to the Company because of other matters it was working on, ongoing integration of other recent acquisitions, the size of the deal, the valuation, and the amount of financing and equity required. In addition, one individual contacted Morgan Stanley during the go shop period, indicating he represented a party interested in a transaction with PPD, but neither he nor anyone he represented signed a confidentiality agreement or was provided further information. He later told Morgan Stanley neither he nor the parties he |

Information Disclosed in The Preliminary Proxy:

Additional Disclosures:

represented were interested in a transaction. As of [October 27], 2011, no other parties expressed interest in obtaining Company information or submitting an acquisition proposal to the Company."

29

# RIDERS

RIDER A

The following table sets forth the multiples calculated by Lazard for each of the selected transactions:

| Announced Date | Acquiror | Target | Transaction Value ($mm) | EV / LTM | |
|---|---|---|---|---|---|
| | | | | Sales | EBITDA |
| 05/04/11 | INC Research LLC | Kendle International Inc. | $354 | 0.81x | 14.2x |
| 12/28/10 | Warbug Pincus Private Equity X, L.P. | ReSearch Pharmaceutical Services, Inc. | 233 | 0.84 | 14.1 |
| 05/06/10 | Thomas H. Lee Partners, L.P. | inVentiv Health, Inc. | 1,113 | 1.03 | 8.1 |
| 02/12/09 | JLL Partners Inc. | PharmaNet Development Group, Inc. | 181 | 0.40 | 6.8 |
| 01/03/08 | WuXi PharmaTech (Cayman) Inc. | AppTec Laboratory Services, Inc. | 163 | 2.31 | 17.2 |
| 12/21/07 | Bain Capital/TPG Capital consortium | Quintiles Transactional Corp. | NA | NA | NA |
| 07/25/07 | Genstar Capital, LLP | PRA International | 761 | 1.99 | 16.2 |
| 07/18/07 | American Capital Strategies, Ltd. | WIL Research Holding Company, Inc. | 500 | NA | NA |
| 02/13/07 | Avista Capital | BioReliance | 210 | 1.91 | NA |

1

| | Partners | Corporation | | | |
|---|---|---|---|---|---|
| 05/09/06 | Kendle International Inc. | Charles River Laboratories International, Inc. – Phase II-IV Clinical Services Unit | 215 | 1.70 | NM |

2

RIDER B
Set forth below is a table summarizing the multiples observed by Morgan Stanley for each of the
comparable companies:

## July 15, 2011

| Company Name | EV / EBITDA | | P / E | | PEG |
| --- | --- | --- | --- | --- | --- |
| | 2011E | 2012E | 2011E | 2012E | 2011E |
| Covance Inc. | 10.8x | 9.4x | 22.1x | 18.5x | 1.3x |
| Charles River Laboratories International, Inc. | 10.8 | 10.1 | 17.3 | 15.2 | 1.2 |
| PAREXEL International Corporation | 9.6 | 8.1 | 23.0 | 17.8 | 1.3 |
| ICON plc | 10.1 | 8.2 | 20.7 | 16.1 | 1.4 |
| WuXi PharmaTech (Cayman) Inc. | 9.0 | 7.6 | 16.1 | 14.2 | 1.2 |

## September 30, 2011

| Company Name | EV / EBITDA | | P / E | | PEG |
| --- | --- | --- | --- | --- | --- |
| | 2011E | 2012E | 2011E | 2012E | 2011E |
| Covance Inc. | 7.6x | 6.6x | 16.7x | 14.0x | 1.0x |
| Charles River Laboratories International, Inc. | 7.9 | 7.4 | 11.7 | 10.6 | 1.0 |
| PAREXEL International Corporation | NM | 6.6 | NM | 13.3 | NM |
| ICON plc | NM | 5.9 | NM | 13.3 | NM |
| WuXi PharmaTech (Cayman) Inc. | 5.6 | 4.9 | 10.8 | 9.4 | 0.8 |

3

| Company Name | July 15, 2011 | September 30, 2011 | % Change |
|---|---|---|---|
| Charles River Laboratories International, Inc. | $41.25 | $28.62 | -30.6% |
| Covance Inc. | 60.20 | 45.45 | -24.5 |
| ICON plc | 24.60 | 16.08 | -34.6 |
| PAREXEL International Corporation | 23.31 | 18.93 | -18.8 |
| WuXi PharmaTech (Cayman) Inc. | 16.70 | 11.64 | -30.3 |

4

RIDER C

Set forth below is a table summarizing the multiples observed by Morgan Stanley for each of the selected precedent transactions:

| Date | Acquiror | Target | Transaction Value | Transaction Value / | |
|---|---|---|---|---|---|
| | | | | LTM Rev | LTM EBITDA |
| 17-May-11 | inVentiv | PharmaNet | NA | NA | NA |
| 4-May-11 | INC Research | Kendle | 360 | 1.1x | 14.2x |
| 7-May-10 | TH Lee | inVentiv | 1,100 | 1.0x | 8.0x |
| 3-Feb-09 | JLL Partners | PharmaNet | 178 | 0.4x | 7.8x |
| 27-Nov-07 | eResearch Technology | Covance ECG Business | 49 | NA | NA |
| 25-Jul-07 | Genstar Capital | PRA International | 790 | 2.2x | 15.1x |
| 13-Feb-07 | Avista Capital | BioReliance | 210 | 2.7x | 9.9x |
| 9-May-06 | Kendle | CRL's Phase II-IV Clinical Services | 215 | 2.1x | 11.6x |

RIDER D

Set forth below is a table summarizing the multiples calculated by Lazard for each of the selected companies:

| Company Name | EV / EBITDA | | P / E | | PEG | |
|---|---|---|---|---|---|---|
| | 2011E | 2012E | 2011E | 2012E | 2011E | 2012E |
| Covance Inc. | 7.6x | 6.6x | 16.7x | 13.9x | 1.04x | 0.86x |
| Charles River Laboratories International, Inc. | 7.9 | 7.4 | 11.6 | 10.6 | 0.90 | 0.82 |
| PAREXEL International Corporation | 7.7 | 6.5 | 18.4 | 14.2 | 1.12 | 0.87 |
| ICON plc | 9.4 | 6.1 | NM | 14.0 | NM | 1.06 |
| WuXi PharmaTech (Cayman) Inc. | 5.7 | 5.0 | 11.0 | 9.1 | 0.90 | 0.75 |

6

RIDER E

The following table sets forth the multiples calculated by Morgan Stanley for each of the selected companies:

| Company Name | AV / EBITDA | | P / E | | PEG |
|---|---|---|---|---|---|
| | 2011E | 2012E | 2011E | 2012E | 2011E |
| Covance Inc. | 7.6x | 6.6x | 16.7x | 14.0x | 1.0x |
| Charles River Laboratories International, Inc. | 7.9 | 7.4 | 11.7 | 10.6 | 1.0 |
| PAREXEL International Corporation | NM | 6.6 | NM | 13.3 | NM |
| ICON plc | NM | 5.9 | NM | 13.3 | NM |
| WuXi PharmaTech (Cayman) Inc. | 5.6 | 4.9 | 10.8 | 9.4 | 0.8 |

7

RIDER F

<u>Management Presentation Case</u>
**(In thousands, except EPS)**

|  | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
|---|---|---|---|---|---|---|
| Net Revenue | $1,523,000 | $1,714,000 | $1,914,000 | $2,124,000 | $2,359,000 | $2,621,000 |
| EBITDA[1] | 341,000 | 407,000 | 487,000 | 559,000 | 633,000 | 726,000 |
| Free cash flow (2) | 85,000 | 156,000 | 234,000 | 320,000 | 351,000 | 409,000 |
| Earnings per share | 1.62 | 1.90 | 2.31 | 2.70 | 3.10 | 3.59 |

<u>Management Sensitivity Case</u>
**(In thousands, except EPS)**

|  | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
|---|---|---|---|---|---|---|
| Net Revenue | $1,523,000 | $1,705,000 | $1,880,000 | $2,065,000 | $2,266,000 | $2,489,000 |
| EBITDA[1] | 341,000 | 398,000* | 456,000 | 520,000 | 581,000 | 655,000 |
| Free cash flow | 85,000 | 151,000 | 216,000 | 297,000 | 323,000 | 369,000 |
| Earnings per share | 1.62 | 1.85 | 2.13 | 2.46 | 2.78 | 3.16 |

(1) EBITDA excludes stock based compensation expense.
(2) Free cash flow equals net income plus depreciation and amortization, stock based compensation and minority interests, less changes in working capital, capital expenditures and acquisitions of investments.

8